(No. 13511.—Judgment reversed.)

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* JAMES VINCI, Plaintiff in Error.

*Opinion filed December 21, 1920.*

1. CRIMINAL LAW—*confession not voluntarily made is not admissible.* A confession not freely and voluntarily made cannot be admitted in evidence.

2. SAME—*when a confession is voluntary.* A confession is voluntary when it is made of the free will of the defendant, without fear or any threat of harm or without promise or inducement by hope of reward and free from the influence of any extraneous and disturbing cause.

3. SAME—*a voluntary confession need not be spontaneous.* A voluntary confession need not be spontaneous, nor is it necessary that it proceed wholly at the suggestion of the accused, but it may be set in motion by external causes, so long as such influences are not what the law deems improper.

4. SAME—*what are not improper methods of obtaining confession.* A confession is not rendered inadmissible by the mere fact that it was elicited by questions put by police officers or others even though the questions assumed the prisoner's guilt and were roughly asked, and an exhortation or adjuration to tell the truth is not an improper influence in obtaining a confession.

5. SAME—*suspects should not be detained without process merely to obtain confessions.* While the detention of the defendant without a warrant will not necessarily render his confession inadmissible if it is otherwise voluntary, the practice of detaining suspects to get confessions is to be condemned, and in determining whether or not a confession was made voluntarily it is proper to take into consideration the fact of unlawful restraint.

6. SAME—*when confession is not voluntary.* A confession obtained from a suspect after continuous questioning for the greater part of three days and four nights by the State's attorney, his assistants and several police officers who had the suspect in charge

cannot be said to have been freely and voluntarily given, where the evident purpose of the interrogation was not for the prosecution of the confessor but to use him as a witness for the prosecution of others whom the confession implicates.

7. SAME—*whether confession is voluntary depends upon facts of each case.* An officer is frequently justified in subjecting a prisoner to a lengthy and vigorous examination to satisfy himself of the guilt of the accused or to secure information leading to the discovery of crime, but the question whether the information so elicited is a voluntary confession depends upon the facts of each case.

8. PRACTICE—*counsel should not in his brief indulge in personalities and insinuations.* Counsel for the plaintiff in error in a criminal case should not in his brief indulge in personalities and insinuations with respect to the State's attorney which are not borne out by the record.

WRIT OF ERROR to the Criminal Court of Cook county; the Hon. JOSEPH SABATH, Judge, presiding.

JAMES J. BARBOUR, for plaintiff in error.

EDWARD J. BRUNDAGE, Attorney General, MACLAY HOYNE, State's Attorney, and NOAH C. BAINUM, (EDWARD E. WILSON, JOHN PRYSTALSKI, JAMES C. O'BRIEN, and JOHN OWEN, of counsel,) for the People.

Mr. JUSTICE THOMPSON delivered the opinion of the court:

Maurice Enright, a labor leader, so-called, was murdered about 6:10 o'clock P. M., February 3, 1920, in front of his residence, 1108 Garfield boulevard, Chicago. Death, which was almost instantaneous, was caused by gunshot wounds, two shots being fired from a sawed-off, double-barreled shot-gun loaded with slugs. When he was shot he was sitting at the wheel of his automobile, which was just coming to a stop in front of his home. The shots were fired by some unknown person, who was in a curtained automobile being driven slowly past the Enright machine. After the shots were fired the speed of the ma-

chine was increased and it sped away north on May street, immediately west of the Enright home. The Perlowski brothers, residing with their parents next door to the Enright home, heard the shots and from the front windows of their second floor apartment saw the fleeing car. They were not able to recognize the make of the car but noticed that it was one of unusual design. The following Saturday they were taken by the police, operating out of the State's attorney's office, to a garage for the purpose of identifying the automobile. From thirty or more machines in that garage they picked out a Templar car owned by Ralph Buglio. It developed that Buglio had loaned this machine a few days before the tragedy to Mike Corrozzo, president of the street cleaners' union, who maintained an office opposite the city hall, at 138 North LaSalle street. The only evidence in the record connecting plaintiff in error with this machine is the testimony of Melf, one of Buglio's drivers, who delivered the machine to Corrozzo a few nights before the tragedy. On this evening, when Melf stopped the Templar car in front of Corrozzo's office, plaintiff in error was standing on the sidewalk and inquired for whom the machine was being left, and Melf told him that it was for Corrozzo and that it was a standard shift. Deceased had had a turbulent career in the city of Chicago and in 1912 was convicted of murder and sentenced to life imprisonment. (*People* v. *Enright,* 256 Ill. 221.) He was in prison but a short time when he was released by pardon. Corrozzo was president of the street cleaners' union in Chicago and Tim Murphy was its business manager. These two men, together with Vincenzo Cosmano, were arrested for the murder of Enright by police officers of the city of Chicago operating out of the State's attorney's office. In Cosmano's room the police found a note-book, in which there was a memorandum which read, "Jimmy Wizzi, Dogles 115." Following this clue, officers went to the Emery Motor Livery Company, whose telephone was Doug-

las 115, and looking over the list of chauffeurs found the
name of James Vinci, plaintiff in error. He was thereupon
arrested and brought to the State's attorney's office, where
he was held as a "suspect under interrogation." The ar-
rest occurred at his home about 6:30 o'clock Wednesday
evening, February 11. He arrived at the State's attorney's
office about seven o'clock and was there questioned about
the Enright case until after midnight. About one o'clock
Thursday morning he was taken to the West Chicago police
station and there locked up under the direction of the State's
attorney as a "suspect under interrogation." Thursday he
was brought back to the State's attorney's office and there
questioned regarding the Enright murder during the day
and until after midnight Thursday night. About one o'clock
Friday morning he was taken to the Fiftieth street police
station and turned over to the turnkey to be held as a "sus-
pect under interrogation." Friday he was brought back to
the State's attorney's office and there questioned during
the day and until after midnight Friday night, when he
was returned to the Fiftieth street police station. Saturday
morning he was brought back to the State's attorney's of-
fice for further interrogation regarding the Enright murder.
Up to this time he had persisted in his denial of any knowl-
edge of the murder. No warrant had been issued for his
arrest and he had not been taken before a magistrate for
examination. No one was permitted to communicate with
him except by permission of the State's attorney's office,
and he was purposely confined in different outlying police
stations so that he could not get in touch with people from
the outside. The interrogation of plaintiff in error contin-
ued throughout the day Saturday until past midnight Sat-
urday night. Shortly after midnight plaintiff in error, in
answer to questions of the State's attorney, admitted that
he drove the car from which Enright was shot and that
Cosmano was the man who fired the shots. The questions
and answers were taken down by a shorthand reporter and

later transcribed. Immediately after the conclusion of the interview, which was about 1:30 o'clock Sunday morning, plaintiff in error asked the State's attorney what he was going to do for him, and the State's attorney replied that if he testified on behalf of the People at the prosecution of Murphy, Corrozzo and Cosmano he would use his efforts to see that plaintiff in error was given his freedom. Plaintiff in error testified before the grand jury and the four suspects were indicted for the murder of Enright. Shortly before the trial of the co-defendants of plaintiff in error was called plaintiff in error repudiated his confession and refused to testify. Plaintiff in error was tried and convicted for the murder of Enright and was sentenced to serve fourteen years' imprisonment in the penitentiary. This writ of error is prosecuted to reverse that judgment, the contention being that the confession on which plaintiff in error was convicted was involuntary and therefore inadmissible.

Plaintiff in error was not satisfied to give a truthful recital of his experiences in the State's attorney's office, which would probably have rendered this statement inadmissible, but he added to his story many false and exaggerated charges. He claimed that he was knocked and kicked about the State's attorney's office and was so bruised and maimed from this violent treatment that he was compelled to treat his injuries with liniment for two weeks. His picture was taken by newspaper photographers Monday, February 16, but the picture showed no signs of physical violence about the head or face of plaintiff in error. Newspaper reporters and his relatives and friends visited him frequently on the 14th, 15th and 16th. He made no complaints to them of ill-treatment and none of them testified to any physical injuries. He charges that assistant State's attorney Prystalski threatened to throw him from a third-story window of the criminal court building and that the police officers threatened to shoot him. He further charges that the

officers gave him whisky and made him drunk before he made the admissions. Substantially all these statements were denied by the officers. It is apparent that neither the trial court nor the jury believed these charges. Plaintiff in error made further and other ridiculous charges, but nothing is to be gained by repeating them here.

We regret that counsel for plaintiff in error permitted himself to be so far carried away with his client's cause that he repeatedly indulged in personalities and insinuations. He refers to the State's attorney's force as "the Hoyne crew," "Hoyne and his outfit," and "the State's attorney and his trained sweat-box hounds," and he charges the State's attorney with maintaining a "third degree" department, which is "a mill to manufacture evidence." He makes reference to luxuries being furnished to "paid State's witnesses," and otherwise charges the State's attorney and his associates with wrongdoing. For example, when he discusses his client's charge that Prystalski threatened to throw him from the window of the criminal court building he uses this language: "It may strike one as strange that an assistant State's attorney would make a threat to throw a man out of the window and to say that he jumped out, but Prystalski is excitable and he was going strong on that night. It is a matter of notorious public knowledge, of record in the coroner's office and given wide publicity in the newspapers, that a man confined in the same sweat-box did meet his death by falling or jumping out of one of these windows. This sweat-box has a reputation all its own, and Prystalski does not see fit to deny the making of the threat when he was there alone with Vinci that night." This court is anxious to have all the light counsel can give us, but heat does not help us reach correct conclusions. The statements set out above will be stricken from the brief.

The authorities all hold that a voluntary confession is admissible in evidence against the person who made it. The

question on which the authorities are divided is what constitutes a free and voluntary confession, and the question most difficult of solution is whether the facts and circumstances in a particular case bring a confession within the rule. It is settled in this State that a confession not freely and voluntarily made cannot be admitted in evidence. (*People* v. *Buckminster,* 274 Ill. 435.) Generally speaking, a confession is regarded as voluntary when it proceeds from the spontaneous expressions of the mind, free from the influence of any extraneous, disturbing cause. It is a confession made of the free will and accord of the defendant, without fear or any threat of harm or without promise or inducement by hope of reward. (1 R. C. L. 553; *Connors* v. *State,* 95 Wis. 77, 69 N. W. 981.) A confession need not be spontaneous, nor is it necessary that it proceed wholly at the suggestion of the accused in order to be voluntary. It may be set in motion by external causes, so long as such influences are not what the law deems improper. A confession is not rendered inadmissible by the mere fact that it was elicited by questions put by police officers or others, even though the questions assumed the prisoner's guilt and were roughly asked. (16 Corpus Juris, 720; 1 R. C. L. 566; *Anderson* v. *State,* 133 Wis. 601, 114 N. W. 112.) An exhortation or adjuration to tell the truth is not sufficient to justify the rejection of a confession. (*Commonwealth* v. *Hudson,* 185 Mass. 402, 70 N. E. 436; *State* v. *Storms,* 113 Iowa, 385, 85 N. W. 610.) We have said that plaintiff in error was being detained without process, but that would not render the confession inadmissible if it was otherwise shown to be voluntary, nor would the fact that he was denied communication with his friends and family render the confession inadmissible. (1 R. C. L. 565.) We do not want to be understood, however, as approving the practice of taking into custody and detaining persons merely suspected of crime for the purpose of getting confessions from them. Such practice deserves the

severest censure and has been repeatedly condemned by the courts of this country. In determining whether or not a confession was made voluntarily it is proper to take into consideration the fact of unlawful restraint. (*People* v. *Trybus*, 219 N. Y. 18, 113 N. E. 538; 16 Corpus Juris, 719.) As we have said, plaintiff in error was questioned during the greater part of three days and four nights by the State's attorney, two of his assistants, his private secretary and several police officers. While we do not believe any physical force was used nor that direct threats or promises were made, there can be no doubt at all that the repeated questioning by these officers, like the constant dropping of water upon a rock, finally wore through Vinci's mental resolution of silence. Admittedly his refusal at first to answer incriminating questions gave evidence of a desire to make no statement. The examination was persisted in by turns until plaintiff in error finally yielded to the importunities of his questioners and gave answers which they sought. It seems clear to us that the accused became convinced that he was bound to make a statement to secure relief from the continuous questioning of those having him in charge, and under the circumstances we do not see how a confession thus obtained can be said to be voluntary. (*People* v. *Borello*, 136 Cal. 367, 119 Pac. 500; *People* v. *Quan Gim Gow*, (Cal.) 138 Pac. 918.) While an officer is frequently justified in subjecting a prisoner to a lengthy and vigorous examination for the purpose of satisfying himself of the guilt of the accused or for the purpose of getting information which would lead to the discovery of crime, whether information thus elicited is a voluntary confession must depend upon the facts of each case. As we understand this record, the theory of the prosecution was that this death grew out of a war among so-called leaders of organized labor in the city of Chicago, and that Murphy, Corrozzo and Cosmano were the parties directly responsible

for the death of Enright. It was not their idea that plaintiff in error had any reason for killing Enright or that he had anything to do with the laying of the murder plot. The State's attorney's office thought he was the driver of the taxicab that hauled the murderer and that he would be able to give them information which would lead to the conviction of the principals. Evidently the object of interrogating plaintiff in error was not to secure from him a voluntary confession with a view to prosecuting him, but the object was to secure from him a statement for the purpose of making him a witness for the prosecution. Aside from the statements of plaintiff in error we think this clearly appears from a consideration of the entire record. During all these hours of questioning, if direct promises of immunity were not made to plaintiff in error, necessarily he understood that if he made statements satisfactory to the State's attorney he would thereby receive immunity from prosecution. While such promises, directly or indirectly, would not affect the competency of the accused as a witness for the People, they would affect the admissibility of his statement as a free and voluntary confession. Under all the circumstances we must hold that this confession was not freely and voluntarily given and that the court erred in receiving it in evidence.

Without the confession of plaintiff in error there is not a scintilla of evidence identifying the murderers of Enright. If there was other evidence in the record showing the guilt of plaintiff in error the admission of this confession would not necessarily require the reversal of the judgment. Holding, as we do, that the confession was not admissible there is no evidence to sustain the judgment, and it is therefore reversed.          *Judgment reversed.*