(No. 27132.—Reversed and remanded.)

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* DAVE GOLDBLATT, Plaintiff in Error.

*Opinion filed May 20, 1943.*

Wм. Scott Stewart, for plaintiff in error.

George F. Barrett, Attorney General, and Thomas J. Courtney, State's Attorney, (Edward E. Wilson, John T. Gallagher, and Melvin S. Rembe, of counsel,) for the People.

Mr. Justice Fulton delivered the opinion of the court:

The plaintiff in error, Dave Goldblatt, was convicted of murder before a jury in the criminal court of Cook county and sentenced to the penitentiary for life.

On the morning of April 23, 1941, Anton Gorczak, a truck driver of the Republic Cleaners and Dyers of Cicero, Illinois, was beaten in a small establishment called the Englewood Cleaners, located at 1745 West 63rd street in Chicago, operated by Abraham Rubin. This beating was administered by an unknown person who was allegedly accompanied by Goldblatt. Gorczak died from his wounds later the same day.

Goldblatt had been employed by the Individual Towel Company as a solicitor and adjuster prior to April 23, 1941. The evidence shows that shortly after this murder captain Daniel Gilbert, of the State's Attorney's police, interviewed various witnesses and persons thought to have some connection with the crime, but that Goldblatt was not interviewed until September 8, 1941. However, prior to September 8, 1941, Daniel Gilbert had had Goldblatt followed by detectives from shortly after the date of the crime.

On September 8, 1941, at about 5:00 o'clock P. M., two police officers jumped on the side of Goldblatt's car as he was pulling into the garage at his home. He was told by them that they desired to have someone look at him regarding a hit-and-run accident. He was asked to go to the town hall police station and went with the officers in his own automobile. When they approached the town hall police station, he was told to go down town. He proceeded down town and asked the officers where they were going and received the reply that they were going to the State's Attorney's office. Upon arriving at the criminal court building, Goldblatt was taken to the witness room in the administration building of the county jail. He remained in the witness room until approximately 10:30 that night.

What happened after this is a matter of serious dispute, but the evidence is uncontradicted that Goldblatt remained in the custody of the State's Attorney's police the night of September 8, all of September 9, all of September 10 without any charge being placed against him, and on September 11 was taken into felony court and charged with murder. The evidence is also uncontradicted that during this time he was interrogated by Daniel Gilbert and various other officers, that he was taken to the scene of the beating with Gilbert and the officers and that during this time he made three statements: (1) an oral statement to Gilbert; (2) a court reporter's transcript of what was said by Goldblatt at the scene of the crime; (3) a court reporter's transcript of questions and answers in an interview between Gilbert, representatives of the State's Attorney's office and Goldblatt. It is admitted that the three statements were made at different times on three different days and contain many conflicting admissions.

A writ of *habeas corpus* was sued out on September 9, 1941. The writ was made returnable on September 10 at 11:00 A. M. and on that day the State's Attorney's office

requested a continuance because they desired more time to continue their investigation. The attorney who had been employed by Mrs. Goldblatt testified that he had requested a representative of the State's Attorney's office to permit him to see his client in the State's Attorney's office on the morning of September 11, but that his request was refused. On neither the 9th, 10th, nor 11th, was Goldblatt produced in court on the *habeas corpus* matter.

On a hearing before the court and out of the presence of the jury on the question of whether or not the admissions or confessions of Goldblatt were voluntary, Daniel Gilbert testified that on September 9 he informed Goldblatt of the fact that a writ of *habeas corpus* had been sued out for him and Goldblatt advised him that he did not want the services of a lawyer and wanted to remain in custody of the State's Attorney's police. However, Gilbert asserts that he never informed the lawyer who had obtained the writ of *habeas corpus* of this fact, nor did he take him into court to verify this fact. Goldblatt denied emphatically that he ever made such a statement.

Gilbert testified that he had been investigating the defendant Goldblatt's connection with this murder for many months and that he had men constantly following him, but that the men were not instructed to pick up Goldblatt until September 8. Gilbert testified that on the evening of September 8, at about 9:30 or shortly thereafter, he saw Goldblatt in Gilbert's office on the second floor of the criminal court building, he being brought into the office by Sergeant Sloey and Sergeant Healy. At this time, he states that Goldblatt said he was working at the Capitol Linen Supply, but that he had previously worked for the Individual Towel at a salary of $50 per week and a $25 expense allowance. At this time, Gilbert states, he told Goldblatt that he had been watching him all summer and that he could tell him every game of golf he played at the Lincoln Park golf grounds. He also stated to him that the only

reason he was locked up after Labor Day was that the courts start their fiscal year after Labor Day and that he was in hopes of having some of the men that were with Goldblatt at the time of the commission of the crime so that they could all be apprehended at the same time.

Goldblatt then stated to Gilbert that he was working at the Individual Towel Company and was called by Gaines from the Champay Cleaners, that he went to see Gaines and Gaines told him that he had a job for him. Goldblatt said that Gaines stated there was a new company out in Cicero in the cleaning and dyeing business that was taking a number of customers away from him, the Englewood Cleaning and Dyeing Establishment being one of them. Goldblatt told Gaines that it would cost more than $25 to get back the customer and that he would need two or three men. At that time Johnny Russo was standing near the office and Gaines said to Russo and Goldblatt that they should go along and take care of that fellow. Gaines said, "Just take care of him. See that he kicks back that stop and put a slug on him." Goldblatt also stated that Gaines gave him $100 and Russo $200, because Russo said he would have to have another man.

This statement, as related by Gilbert, continued describing the manner in which they obtained Gorczak's name and telephone number, the call to Gorczak's home, threatening him, and obtaining the necessary automobiles. In this statement Goldblatt said that Gaines got an Oldsmobile car for Russo and that Goldblatt and Russo followed the driver around on his stops to various tailor shops and that they then went back to Gaines and told him it was necessary to have three men and that Gaines supplied them with another car for the following day. On that day Goldblatt drove his car and Russo and the other man Goldblatt did not know drove the car which Gaines had obtained for them. According to Goldblatt's

statement, both cars went over and parked near the Engle-wood Cleaning Establishment and waited there for Gorczak to arrive with the cleaning truck. Goldblatt said that when it did arrive, Russo and the other man got out of the car and followed the driver in. Goldblatt stated that he remained outside and heard screaming and hollering and ran up to the door, but when he got to the door Russo and the other man were about ready to come out. He says he told them to come on. They got in their cars and drove away to the restaurant on Forty-seventh street and told Gaines what had happened. This statement was made orally to Gilbert and according to Gilbert was completed by one o'clock in the morning of September 9.

The second statement was made in the evening of September 9 and early morning of September 10. Gilbert had made arrangements with the owner of the Englewood Cleaners for them to visit the place of the crime. On that occasion a court reporter was present in addition to Gilbert, Lt. Kelly, Rubin, the owner of the place, and Cloutier, a colored pressman who had been present at the time of the crime. According to this statement, Goldblatt places himself inside the establishment. He states that there were two men with him, but that he had a pistol and that he ordered everybody to go in the back room. He identifies Rubin as the man that was handling the clothes with the driver and identifies the colored man as standing near the pressing machine.

When asked, "What did you do when they got back there?" he answered, "I don't remember." He was next asked, "Did you make them lie down on the floor?" to which he answered, "Everybody down." According to this statement, he was on the inside with one other man and another man was on the outside. Cloutier said that there was no screaming, and neither Rubin nor Cloutier was positive in his identification of Goldblatt, Cloutier

saying, "That is the first time I ever saw him, tonight, since that time, and I would not be able to say it was him until he acknowledged it."

In this second statement Gilbert testified that when they first arrived in the store he told Goldblatt to show what he had done, but that Gilbert took him outside for a few minutes and talked with him during the taking of the statement. Gilbert's testimony of what occurred at this time is as follows: "He said, 'This settee would be the east wall. The beating took place here. He hit the fellow here on the floor.' I said, 'Where did he fall? Just the position he fell in.' He said, 'He fell this way, with his head, would be the rear of the store would be south, and his feet to the north.' I said, 'Go ahead.' At that time Lt. Kelly said to me, 'He is lying to you,' so I said to him, 'I thought you were going to tell your story here.' He said, 'Can I talk to you?' I said, 'Yes.' 'Will you step outside?' I said, 'Yes' again. We stepped outside. He said, 'I told you I was on the outside.' I said, 'I don't care where you were. If you were in this crime you could have been in bed at home. If you were in a conspiracy you are equally as guilty as the person who used the club.' 'You said you were going to re-enact this crime. Go ahead and re-enact the crime.' Goldblatt said, 'All right.' 'You know I told you I was not on the inside. I can't tell you, I was not here. I don't know anything about what happened.' He said, 'All right then, I will go inside.'" This does not appear in the transcript of the re-enactment taken by the court reporter.

The third confession was taken in the witness room of the administration building of the Cook county jail on Wednesday, September 10 at about noon. This confession is signed by Goldblatt and his signature is witnessed by Thomas A. Kelly and William B. Crawford and it appears from the signed confession that it was signed at 5:50 P. M. Present at the taking of this confession were assistant

State's Attorneys Crowley and Crawford, captain Gilbert, Harvey, the court reporter, and Goldblatt. This confession places Goldblatt inside the store. From the reading of this confession, one is lead to believe that it was the purpose of the questioners to place as much responsibility upon Gaines as possible and to implicate him with the commission of the crime.

At the close of this confession the following questions and answers appear: "If these same questions were asked you in connection with this matter at a future date, would your answers be the same? A. What do you mean? Q. Any place that you are asked these same questions, would your answers be about the same? A. About the same. Q. Mr. Crawford—In other words, is this the truth what you have told us, as near as you can recall it? A. Yes, sir. Q. Mr. Crowley—When the statement is written up, will you sign it? A. Yes, sir." This indicates that it was not intended by the authorities as a confession only, but was intended to give them some basis for holding Gaines and Tom and John Russo, whose names were used frequently during the interrogation.

On the trial and on the hearings before the court, Goldblatt related a story of continued abuse, beating, torture and mistreatment from the time of his arrest until he was formally charged with a crime in the felony court on September 11. Conceding that his statements may be greatly exaggerated and perhaps some of them false, his physical condition upon his admission to the county jail is corroborative of at least some mistreatment. On September 13 he was examined by Doctors Levy, Hulbert, Toman, Theodor and Bauer. Dr. Theodor was the county jail physician. Dr. Bauer was working as an intern at the county jail. They all testify that they found multiple abrasions about the size of a pea on Goldblatt's chest; discolorations about the size of a half dollar to the right of the stomach region; small areas of discoloration over

the right buttocks; and that both wrists were swollen. Dr. Bauer testified that he treated Goldblatt and that an abscess had formed on the left wrist which he lanced and drained; that the hair was worn off both wrists and that they were red and inflamed.

There was testimony by the State to show that Goldblatt's injuries were self-inflicted but such evidence could not account for nor explain the condition of the two wrists or the bruises on the shoulder, back and buttocks. Gilbert and the other officers testified positively that no promises of immunity were made to Goldblatt and that he was not threatened, struck, beaten or abused. Seemingly the story of the plaintiff in error as to how this condition came about, although appearing somewhat fantastic and perhaps exaggerated, is quite in accord with his physical condition on September 13.

Substantially all of the admissions included in the so-called confessions were repudiated by Goldblatt on the trial. Two eyewitnesses to the murder testified at the trial and neither of them was absolutely positive of Goldblatt's identity. Immediately after the crime was committed officer William Dooling talked with the two witnesses, Rubin and Cloutier, for about twenty minutes, getting the description from Rubin at that time. He described the two who administered the beating as follows: "No. 1 is 30 years old, five feet eight, 160 pounds, medium build, dark complexion, dark hair, dark gray double breasted suit, dark blue fedora hat, carrying a blue steel automatic revolver. No. 2, 25 years old, five feet eight, 145 pounds, medium build, light complexion, dark gray suit, medium gray fedora hat, carrying a wooden club about one foot long, one inch thick." Goldblatt at the time of the trial was 40 years of age, swarthy, five feet three and one half inches tall and at the time of his arrest weighed 173 pounds. It will thus be seen that Goldblatt does not answer the description of either of the killers as given to officer Dooling a few minutes after the occurrence.

It is apparent from the record that the admissions made by Goldblatt constituted almost the entire State's case against him and the conviction could not stand if such evidence be excluded. Therefore the main question for this court to decide is whether these incriminating statements, made under the circumstances heretofore summarized, were properly admitted as evidence on the trial, their admission in evidence having been objected to by plaintiff in error.

Confessions are competent evidence only when they are voluntarily made. (*People* v. *Sweeney,* 304 Ill. 502; *Robinson* v. *People,* 159 Ill. 115; *People* v. *Fox,* 319 Ill. 606.) It is settled in this State that a confession not freely and voluntarily made cannot be admitted in evidence. (*People* v. *Buckminster,* 274 Ill. 435; *People* v. *Vinci,* 295 Ill. 419.) A confession is regarded as voluntary when it is made of the free will and accord of the accused without fear of any threat of harm or without promise or inducement by hope of reward. It need not be spontaneous and it is not necessary that it be wholly made upon the suggestion of the accused. A confession is not rendered inadmissible by the mere fact that it was elicited by questions put by police officers or others or by the fact that the accused was exhorted to tell the truth. Nor does the mere fact that a confession was made while in the custody of the police render it inadmissible. It is not necessary that the accused be warned that the confession might be used against him. *Wilson* v. *United States,* 162 U. S. 613; *People* v. *Fox,* 319 Ill. 606.

Whether the confession is voluntary is a preliminary question which must be decided by the court from evidence of threats or promises. The rule that confessions must be voluntary in order to be competent was not established to protect the guilty against truthful confessions, but was designed to guard the innocent against a false confession made under duress, promise of reward or some other inducement. (*People* v. *Fox,* 319 Ill. 606.) The

decision of the court on this preliminary question as to admissibility of the confession will not be disturbed unless it is manifestly against the weight of the evidence. *People* v. *Fox,* 319 Ill. 606; *Hopt* v. *Utah,* 110 U. S. 574.

The case at bar is very similar to *People* v. *Vinci,* 295 Ill. 419. In the *Vinci case,* Enright was murdered in front of his residence by shots fired by an unknown person in an automobile driven past Enright's car. Vinci, a chauffeur, was arrested and brought to the State's Attorney's office where he was held as a "suspect under interrogation." He was arrested at 6:30 P. M. Wednesday, February 11. He arrived at the State's Attorney's office at about 7:00 o'clock and was questioned until after midnight. About 1:00 o'clock A. M., Thursday morning, he was taken to the West Chicago police station and locked up as a "suspect under interrogation." On Thursday, he was taken back to the State's Attorney's office and questioned until after midnight Thursday night, when he was taken to the Fiftieth street police station and there held as a "suspect under interrogation." Friday he was brought back to the State's Attorney's office and there questioned until after midnight Friday, when he was returned to the Fiftieth street police station. Saturday morning he was brought back to the State's Attorney's office for further questioning. No warrant had been issued for his arrest and he had not been taken before a magistrate for examination. No one was permitted to communicate with him except with permission of the State's Attorney's office. On Saturday night, shortly after midnight, Vinci admitted that he drove the car from which Enright was shot. Immediately after the conclusion of the interview, Vinci asked the State's Attorney what he was going to do for him, and he was informed that if he testified for the People, the State's Attorney would use his efforts to see that he was given his freedom. He testified before the grand jury and the grand jury indicted Vinci, along with three other people, for the crime.

Shortly before the trial of his codefendants, Vinci repudiated his confession and refused to testify against them. He was tried and convicted of murder. He, like Goldblatt, gave a fantastic story of being knocked and kicked about the State's Attorney's office.

This court, in the *Vinci case,* said, at pages 425 and 426, "We have said that plaintiff in error was being detained without process, but that would not render the confession inadmissible if it was otherwise shown to be voluntary, nor would the fact that he was denied communication with his friends and family render the confession inadmissible * * * we do not want to be understood, however, as approving the practice of taking into custody and detaining persons merely suspected of crime for the purpose of getting confessions from them. Such practice deserves the severest censure and it has been repeatedly condemned by the courts of this country. In determining whether or not a confession was made voluntarily it is proper to take into consideration the fact of unlawful restraint * * * as we have said, plaintiff in error was questioned during the greater part of three days and four nights by the State's Attorney, two of his assistants, his private secretary and several police officers * * * it seems clear to us that the accused became convinced that he was bound to make a statement to secure relief from the continuous questioning of those having him in charge, and under the circumstances, we do not see how a confession thus obtained can be said to be voluntary."

The judgment of conviction in that case was reversed by this court. The methods used to secure a confession in the present case were strikingly similar to those used by the authorities in the *Vinci case.* Goldblatt was subjected to extensive interrogation day and night for nearly three days. He was not permitted to see relatives or friends and had no lawyer with whom he could consult. He had been trailed by detectives for almost six months

and yet no charge was placed against him until the State's Attorney had been ordered by a court to produce him in response to a writ of *habeas corpus*. No warrant had been issued for his arrest, and he was not taken before any magistrate for examination until after a *habeas corpus* writ had been obtained in his behalf.

Section 10 of article II of the Illinois constitution provides that no person "shall be compelled in any criminal case to give evidence against himself." Section 7 of division VI of the Criminal Code, (Ill. Rev. Stat. 1941, chap. 38, par. 660,) provides, "When an arrest is made without a warrant, either by an officer or a private person, the person arrested shall, without unnecessary delay, be taken before the nearest magistrate in the county, who will hear the case, for examination, and the prisoner shall be examined and dealt with as in cases of arrests upon warrant."

The evidence in this case leads us to the conclusion that the plaintiff in error became convinced that he was bound to make a statement to secure relief from the constant questioning of those having him in charge, and under the authority of *People* v. *Vinci,* 295 Ill. 419, and the circumstances surrounding this case, we do not see how a confession thus obtained can be said to be voluntary. We believe the ruling of the trial court, that the confession was voluntary, was manifestly against the weight of the evidence.

The principles announced in this case appear to be in full accord with those contained in a recent decision of the United States Supreme Court, *McNabb* v. *United States,* 87 L. ed. 579.

There being no competent evidence upon which to base a verdict of guilty, the judgment of the criminal court of Cook county is therefore reversed, and the cause remanded.

*Reversed and remanded.*