(No. 36701.—

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* CHESTER OTTO WEGER, Plaintiff in Error.

*Opinion filed September 28, 1962.*

JOHN A. McNAMARA, of Marseilles, for plaintiff in error.

WILLIAM G. CLARK, Attorney General, of Springfield, and ROBERT W. RICHARDSON, State's Attorney, of Ottawa, (FRED G. LEACH and E. MICHAEL O'BRIEN, Assistant Attorneys General, and ANTHONY C. RACCUGLIA, Assistant State's Attorney, of counsel,) for the People.

Mr. JUSTICE HERSHEY delivered the opinion of the court:

On March 14, 1960, three women were killed in Starved Rock State Park. On November 18, 1960, the LaSalle County grand jury returned three separate indictments, each charging the defendant, Chester Weger, with the murder of one of the women. He was tried on the indictment that charged him with the murder of Lillian Oetting, was found guilty by the jury, and was sentenced to the penitentiary for a term of life imprisonment. A writ of error has been issued to review the judgment of conviction.

The defendant's principal contention is that his constitutional rights were violated when the trial judge applied an unconstitutional standard in determining that his written and oral confessions should be admitted in evidence against him. A lengthy hearing upon the admissibility of these confessions was conducted by the trial judge out of the presence of the jury. At that hearing the defendant testified that he was first questioned for about two hours on March 17. He was again interrogated on March 19 for about the same length of time, and about a month later he was questioned

from about 5:00 P.M. until 2:30 the next morning. On none of these occasions was he physically abused, nor was he threatened in any way.

On September 27, he voluntarily went to Chicago to take a lie-detector test. No threats or promises were made to him on the way to Chicago. He testified, however, that John Reid, who conducted the examination, told him that he had lied, asked him to tell the truth and suggested that he could take "truth serum" if he desired, but that he refused. He testified that Reid then threatened to get a court order to force him to take the serum, and attempted to contact a judge to secure such an order. He also testified that after the test had been concluded, the State's Attorney told him that if he would sign a confession, he would get life imprisonment, but if he did not, he would get the electric chair, and that all the way home from Chicago, a deputy sheriff, Bill Dummett, told him that if he did not sign a confession he would get the electric chair, but if he confessed he would get life, which meant that he could get out in fourteen years. Defendant did not confess at this time and was not placed under arrest.

He was interrogated on and off during the month of October, but no further threats or promises were made until November 16. At about five o'clock in the afternoon of November 16, Dummett and another deputy, Wayne Hess, came to defendant's home and said they wanted to talk to him. They took him to the State's Attorney's office in Ottawa where he was interrogated by Dummett, Hess and the sheriff. At about eight o'clock he was served with nine warrants, three of which were in connection with the Starved Rock murders. He testified that he was then placed in a line-up with several other men and was viewed by witnesses and victims of the other crimes; that following the line-up, he was questioned further concerning the murders, and that at this time, Dummett and the sheriff told him that it would

go easier with him if he confessed, and that if he did not confess, he would get the electric chair.

The defendant asked if he could see his wife and his father and was told that they were on the way to see him. They arrived at about one o'clock in the morning of the 17th, and defendant was permitted to talk to them alone. Immediately after they left, at about two o'clock, the defendant orally confessed to the three murders. At the time of this confession, only Hess was present, but when Dummett returned to the room, defendant repeated his oral confession. A court reporter was then summoned and defendant signed a written confession. The following day he was taken to Starved Rock Park for a re-enactment of the crimes and he then signed another written confession.

All of the defendant's testimony with respect to the threats of the electric chair and the promises of leniency was denied by the parties directly charged with making those threats and promises. However, a former assistant State's Attorney who was in the car on the trip back from Chicago after the lie-detector test on September 27, testified that he heard deputy Dummett tell the defendant that he would "ride a thunderbolt," and that the defendant had replied that he did not think he would go to the chair because he didn't kill the ladies. This witness testified that the words "thunderbolt" and "chair" were used several times that night. He denied, however, that there was any threat or promise contingent upon whether the defendant did or did not confess.

At the conclusion of the hearing, the trial judge ruled that the confessions were voluntary and admissible.

We have repeatedly said that, upon preliminary inquiry into the voluntary nature of a confession, the question of its competency is for the trial court and that, in making its decision, the trial court is not required to be convinced of its voluntary nature beyond a reasonable doubt, (*People* v.

*Nemke,* 23 Ill.2d 591; *People* v. *Sims,* 21 Ill.2d 425,) and the decision of the trial court on the question of admissibility will not be disturbed unless it is manifestly against the weight of the evidence. (*People* v. *Townsend,* 11 Ill.2d 30; *People* v. *Gavurnik,* 2 Ill.2d 190.) If the record before us contained only the evidence at the hearing on the admissibility of the confession and the bare ruling of the trial judge thereon, we would have no question but that his ruling that the confessions were admissible should be sustained. However, in announcing his ruling, the trial judge undertook to explain the reasons for his ruling. Defendant contends that this explanation shows that the trial judge applied a standard that has been held constitutionally impermissible by the Supreme Court of the United States (*Rogers* v. *Richmond,* 365 U.S. 534, 5 L. ed. 2d 760,) and that his conviction cannot stand. Because of the importance of this explanation in view of the standards that the Supreme Court of the United States has determined must be applied in determining the admissibility of confessions, we quote the ruling in full. The judge said:

"This Court is well aware of the terrible burden that it has in this matter. This Court and this Court alone stands between the People, who are clamoring for a victim, and the defendant, who is pleading for his rights and for true and proper justice to him.

"This is a case which has had wide publicity and in which the life of this man is on the line. I wouldn't want anyone to think that I have or am deciding in a light or hurried mood. I have personally spent many sleepless nights since these hearings began, and I have personally wrestled with the law and the facts involved for many hours.

"What I am about to do other judges might not do or might do differently. What I can do is use the ability which God gave me to try to do what is right. I have a duty to both the defendant and the State. I have as much obligation to protect the People as I have to protect those charged with

the crime, and I might say that I have not leaned over backwards or searched for technicalities to favor the defendant. I have tried to stand up straight and judge these facts in accordance with the law as I find it to be. And what that law is has been set down by the Supreme Court of this State, by the Supreme Court of the United States. And whether I like it or not, I am bound by it.

"Now, there is no better way to cite the law than to quote it from the Supreme Court: 'A confession is regarded as voluntary when it is made of the free will and accord of the accused, without fear or any threat of harm, or without promise or inducement by the hope of reward. Whether a confession is involuntary is a preliminary question which must be decided by the trial court from evidence heard outside the presence of the jury, and *the real question presented to the Court is not whether there is evidence of threats or promises, but whether there has been any threat or promise of such nature that a prisoner would be likely to tell an untruth from fear of threat or hope of profit from the promise.* Thus it has been held that a confession is not rendered inadmissible by the mere fact it was made while in the custody of the police or by the fact that it was made after the accused was illegally arrested or detained without process, or because it was elicited by questions put by the police, or came after exhortations to tell the truth. Upon preliminary inquiry into the voluntary nature of a confession, the question of its competency as evidence is for the trial court, alone, to decide, and, in making its decision, the Court is not required to be convinced of its voluntary character beyond a reasonable doubt.'

"Now, the testimony of the defendant, his father, and the basis for his position insofar as these confessions are concerned, is that through fear he was induced by threats of the electric chair and promises of leniency to say what he did.

"The position of the State as to the testimony of the

State's Attorney, the Sheriff's deputies, and various other people who were brought here, is that there were no threats or promises which induced this man to tell an untruth.

"The issue, therefore, is whether the defendant signed the confessions through fears or hope and resolves itself almost completely into a determination of which witnesses were telling the truth and what the effect of their testimony was.

"In my judgment the tenor of all the evidence gives rise to a moral certainty that the defendant knew what he was signing, and does little to establish that he gave way through fear, hope or purported emotional upset.

"The testimony of the officials is not materially inconsistent or inherently improbable, and remained unshaken despite incisive cross examination.

"I find no merit in the contention that the procedures employed in obtaining the confessions exceeded the limits fixed by constitutional standards or due process and fundamental fairness. It does not appear to me that the questioning was any more persistent that would be expected in a murder investigation; nor does it appear that the methods employed offended the civilized standards of our society.

"It is my conclusion that these confessions were obtained after an orderly process of questioning and investigation by officers of experience and integrity.

"I find no basis for believing that the confessions were obtained through fear or hope. In my judgment they were voluntary. *I do not believe there was any threat or promise which was of such a nature as to cause the defendant to tell an untruth."* (Emphasis supplied.)

Seizing upon the italicized language in the above quoted explanation, defendant argues that, in determining the admissibility of the confessions the trial judge applied a standard that took into consideration the probable truth or falsity of the confessions, and maintains that, under the recent decision of the United States Supreme Court in *Rogers* v.

*Richmond,* 365 U.S. 534, this is a constitutionally inadequate standard, and that a conviction based in part upon confessions admitted in evidence by reference to such standard cannot stand.

In *Rogers* v. *Richmond,* 365 U.S. 534, decided since the trial of the present case, the Supreme Court of the United States has made it abundantly clear that, for the purpose of determining the admissibility of a confession under the due process clause of the Federal constitution, a standard which takes into consideration the probable truth or falsity of the confession is impermissible, saying: "The attention of the trial judge should have been focused, for purposes of the Federal Constitution, on the question whether the behavior of the State's law enforcement officials was such as to overbear petitioner's will to resist and bring about confessions not freely self determined—a question to be answered with complete disregard of whether or not petitioner in fact spoke the truth." 365 U.S. at 544.

In *Rogers* v. *Richmond,* the court had before it a judgment of conviction of murder in a Connecticut case. Both the trial court and the Connecticut Supreme Court of Errors had taken into account the probable truth of the defendant's confessions in ruling that they were admissible. In reaching its conclusion that the Connecticut trial court had used an impermissible standard, which required the conviction to be set aside, the United States Supreme Court was influenced not only by the remarks of the trial judge but also by the opinion of the Connecticut Supreme Court of Errors affirming the conviction, in which that court, conceding that the police officers had engaged in illegal and improper conduct, stated that this would not vitiate the confessions unless it induced the defendant to confess falsely. (365 U.S. 534, 542-3, 5 L. ed. 2d 760, 767-8; citing 143 Conn. 167, 173-4, 120 A. 2d 409, 412.) The United States Supreme Court also cited a host of Connecticut cases applying in similar situations a standard that took into

consideration probable truth or falsity, and derived from this line of cases "confirmation of our conclusion that the language of the trial judge and of the Supreme Court of Errors in the Rogers Case is not the product of mere verbal inadvertence or unreflective phraseology, but an accurate embodiment of the mode of reasoning which led to holding that petitioner's confessions were admissible as 'voluntary.' " 365 U.S. 534, 543, 5 L. ed. 2d 760, 768, n. 1.

We have heretofore quoted in full the trial judge's explanation of his ruling on the admissibility of the confessions. Although the italicized portions, if viewed in isolation, suggest a standard similar to that condemned in *Rogers* v. *Richmond,* we believe from our examination of the record that the confession was admissible when appraised by standards related only to its voluntary character without regard to its truth or falsity.

The factors that have usually been considered as indicating coercion are conspicuously lacking in defendant's own testimony. He admitted that he was subjected neither to physical mistreatment nor any threats thereof. He was not deprived of food or sleep for any unreasonable periods of time. There were no periods of prolonged and unrelenting questioning comparable to those in *Ashcraft* v. *Tennessee,* 322 U.S. 143, 88 L. ed. 1192; *People* v. *Vinci,* 295 Ill. 419; or *People* v. *Goldblatt,* 383 Ill. 176. The defendant's claim centers upon threats of the electric chair if he did not confess and promises of a lesser punishment if he did. He testified that the first of these threats and promises occurred at the time of the trip to Chicago on September 27. He also testified that similar threats and promises were made before he confessed on the night of November 16. Since the defendant did not confess until over seven weeks after the trip to Chicago, it is obvious that his confession was not coerced by any threats or promises made at that time, and he, in his own testimony said as much. Thus, the defendant's claim rests entirely upon the

threats and promises said to have been made on the night he confessed. His testimony as to these threats and promises was denied by those charged with making them, and is not corroborated.

Defendant's father, Herschel Wayne Weger, testified that he, in company with defendant's wife and mother, arrived at the court house sometime between eleven and twelve o'clock the night of November 16. They went first to the sheriff's office, where sheriff Eustey told the father that the charges against his son were serious and said, "You don't want him to go to that little green room," meaning the electric chair. The father answered, "No," and the sheriff said, "Go up and tell him to tell the truth." Defendant's parents and his wife were then taken to a room near the room in which the defendant was being interrogated. They waited there some 15 or 20 minutes. The door was open, and the father could hear the questioning. He testified that he heard deputy sheriff Dummett say to the defendant repeatedly, "You know you did it. Why don't you come clean and say you done it? Why do you want to treat your wife and children like that, and why do you want to treat your father and mother like that? Come clean and tell us about that." However, his father testified that he heard no threats, nor any mention of the electric chair.

The three members of his family were then taken into the room where the defendant and Dummett were. The father testified that he asked defendant three or four times whether he had committed the crime or not, but the defendant "didn't talk." The father was then permitted to talk with his son in private. He then asked his son again whether he had committed the crime, and the defendant said, "Daddy, I did not." The father told the defendant that he would get an attorney. He did not communicate to his son the sheriff's remarks about the "little green room," and he testified that the defendant said nothing to him about having been threatened with the electric chair, he testified

that the defendant did not look scared and did not appear to have been mistreated in any way. Thus we have no mention of threats or promises while the father and son were alone, only minutes before the first confession.

The father testified that, just before the family left, the defendant's mother ran up to the defendant and cried, "Son, tell the truth. I have always raised you like a son." She did this on her own initiative, without any suggestion or prompting on the part of the authorities. Defendant's initial confession followed almost at once, while his family were leaving the building. When the defendant was recalled as a witness after his father had testified, however, he said that, after the departure of his family, deputy sheriff Dummett again threatened him with the electric chair.

Even if defendant's testimony that threats of the electric chair and promises of a less severe punishment were made earlier in the evening and after the departure of his family is accepted as true, the possibility that these threats and promises suddenly became effective to produce a confession is most remote. Similar earlier threats had not had any effect, and those made before the arrival of the family were apparently not considered important enough to mention to his father when they were alone. The defendant's suggestion that he confessed because he became enraged at remarks indicating that his wife was untrue is not clear, nor is its role in producing his confession apparent. We conclude that the spontaneous appeal of his mother must have been the factor that triggered the confession, and that it was not involuntary. We are of the opinion that the trial court was correct in holding the confessions to be voluntary and admissible.

The substance of the confessions admitted in evidence is as follows: On the morning of March 14, Weger, then a dish-washer at the Starved Rock Lodge, completed his usual morning tasks at the Lodge at approximately 11 o'clock A.M. He wrote a letter to a friend and ate lunch

around 11:30, then returned to work, helping with the wash-
ing of the luncheon dishes and pots. He finished shortly
before three and left the Lodge soon thereafter. He walked
down the trail to St. Louis Canyon, taking about twenty-five
minutes. He first encountered the three women near a
bridge at the entrance to the canyon. Thinking it was a
purse, he grabbed at a strap hanging over the shoulder of
one of the women, who was later identified as being Mrs.
Oetting, but it turned out to be a pair of binoculars. He
began to run past the women, back out of the canyon, when
Mrs. Murphy started hitting him with a camera or pair of
binoculars. Mrs. Oetting also began striking him with some-
thing sharp and he seized her by the arms, saying that he
meant them no harm. The women agreed to walk with
Weger back into the canyon on condition that he would
agree to let them go. When they reached the end of the
canyon, near a waterfall, he told them that he would have to
tie them up. Mrs. Murphy again began hitting him and he
grabbed her arm and told her that he was not going to
harm them. He tied the women up with some pieces of
string that he was carrying. As he was leaving, Mrs.
Murphy broke free and began hitting him with her camera.
He became angry and hysterical, picked up a club lying
nearby and hit her in the head with it. He carried her to a
cave near where the other women were sitting. Mrs. Oetting,
who had one arm free, began striking and scratching him,
and he then hit her and Mrs. Lindquist in the head with the
club. He dragged their bodies into the cave because there
was a red and white Piper Cub flying in the area which he
thought might be a police plane. He then went back to the
Lodge.

The confession was amply corroborated by other cir-
cumstances in evidence. Many of Weger's coemployees
testified that they had noticed scratches on his face on the
evening of the 14th or shortly thereafter. An examination
of the jacket he said he was wearing on the day of the

murders revealed bloodstains thereon. The owner of the airplane Weger said he saw was located and testified that he had indeed been flying in the Starved Rock area on the day of the murders. There was also testimony by a wood expert that a piece of wood found in Mrs. Oetting's head came from a long club found near the scene of the murders, which the defendant had confessed was one of the murder weapons. Other physical evidence found at or near the scene of the crime all tend to corroborate further the defendant's confession. When all the facts and circumstances are considered, together with the confession, all elements of the *corpus delicti* were established beyond any reasonable doubt.

It is next contended that numerous prejudicial errors were committed during the trial which require a reversal of the conviction. The first of these is that evidence of the two other murders was inadmissible. However, the evidence of the death of the two other women was clearly admissible as part of the *res gestae*. (*People* v. *Ciucci,* 8 Ill.2d 619, 625, aff'd *per curiam,* 356 U.S. 571, 2 L. ed. 2d 983; *People* v. *Murphy,* 276 Ill. 304; *Hickam* v. *People,* 137 Ill. 75.) The evidence in reference to the killing of Lillian Oetting was inseparable from the evidence in relation to the killing of Mrs. Murphy and Mrs. Lindquist and reference thereto a number of times during the trial was unavoidable.

Defendant's next contention concerns alleged improprieties on the part of certain jurors and the male bailiff. An affidavit of one of the jurors, Harry Hermann, was submitted by counsel for the defendant alleging that the newspapers which were given to the jurors had been improperly censored and that they were permitted to read articles concerning the trial; that the male bailiff had told some of the jurors that "they have enough on tape recorders in the Court House to perjure every man and woman on this jury"; that the jurors had not been segregated from strangers who were staying at the same hotel where the jury was contained dur-

ing the trial; and a number of other instances of misconduct. One of the major allegations concerns the conduct of one of the jurors whose husband died during the course of the trial. Pursuant to the consent of the judge and counsel for both sides, the trial was recessed and the juror allowed to go home in order to attend the funeral of her husband. As she was leaving, she purportedly told the male bailiff, "Chuck, if I don't get back, be sure to find this man [Weger] guilty."

To counteract this affidavit, the State introduced the affidavits of both the male and female bailiffs and of nine of the remaining jurors to the effect that juror Hermann had been abusive, coarse and vulgar during the entire time of the trial; that he used offensive language, particularly directing it against the female jurors; and that, at the conclusion of the trial, he had promised to "hang" the jury. These affidavits also averred that the juror whose husband had died was too distraught to make the alleged statement, and that they had heard her say no such thing. These affidavits also denied the other allegations contained in Hermann's affidavit.

We are of the opinion that the trial judge did not abuse his discretion in refusing to grant a new trial on the basis of Hermann's affidavit. Furthermore, in circumstances such as the present case, a juror will not be allowed to impeach his own verdict. *People* v. *Pulaski*, 15 Ill.2d 291; *People* v. *Miller*, 13 Ill.2d 84; *People* v. *Geisler*, 348 Ill. 510; *People* v. *Rettich*, 332 Ill. 49; *People* v. *Quinn*, 313 Ill. 351; *Reins* v. *People*, 30 Ill. 256.

The final error complained of by defendant is that reversal is required by certain portions of the State's Attorney's closing argument in which he said that he believed that the defendant had committed the crime. However, when his remarks are considered in context, he was doing no more than drawing conclusions from the evidence, which is not error. *People* v. *Reed*, 333 Ill. 397, 418-19; *People* v.

*Lawson,* 331 Ill. 380, cert. den. 282 U.S. 815, 75 L. ed. 729.

We therefore have reached the conclusion that the defendant has had a fair and impartial trial. We are unable to say, after a consideration of the record and close analysis of the contentions made by the defendant, either that there was trial error of a substantial and reversible character, or that there is any reasonable or well-founded doubt as to the guilt of the accused. There is no justification for our interference with the verdict of the jury. The judgment of the circuit court of La Salle County is affirmed.

*Judgment affirmed.*