**People of the State of Illinois, Plaintiff-Appellee, v. Fred Alexander (Impleaded), Defendant-Appellant.**

Gen. No. 51,668.

First District, First Division.

May 27, 1968.

Gerald W. Getty, Public Defender of Cook County, of Chicago (Norman W. Fishman and James J. Doherty, Assistant Public Defenders, of counsel), for appellant.

John J. Stamos, State's Attorney of Cook County, of Chicago (Elmer C. Kissane and John F. Ward, Jr., Assistant State's Attorneys, of counsel), for appellee.

MR. JUSTICE ADESKO delivered the opinion of the court.

Two indictments for robbery were returned against defendant. He was found guilty in a bench trial and sentenced to the Illinois State Penitentiary for a term of not less than one year, nor more than five years on each indictment, to be served concurrently and not consecutively. Prior to the trial of this cause, he moved to suppress his confession which he claimed was obtained only after he was savagely beaten by the police. The motion to suppress was denied and defendant appeals claiming this was error and that he was not proven guilty beyond a reasonable doubt.

On December 17, 1965, the Victory Food Mart at 5907 S. State Street, in Chicago, was robbed by two black men. On December 31, 1965, a tavern at 5722 S. State Street, in Chicago, was robbed and a patron was shot as he tried to flee from the premises. According to the testimony of the police, one George Reynolds and Fred Alexander, the appellant here, were arrested at

about 2:00 p. m., on January 1, 1966. Reynolds and Alexander were taken to the Area 1 Robbery headquarters where they were handcuffed to chairs on opposite sides of a large open office and questioned about the two robberies. Alexander was advised that he did not have to make a statement but he was not advised of his right to counsel.

Officer Spangelo, who questioned Alexander, denied that any force, threat, coercion, or violence of any nature was used, nor were any promises made. Spangelo also denied that his partner, officer Hein, used any force such as striking Alexander in the face or kicking him in the groin. The officer testified that at no time did he see defendant's face bleeding, nor was the defendant ever taken down into the basement of the police station. Spangelo acknowledged that the Task Force has lockers in the basement, but otherwise could not describe the basement.

Officer Hein also testified that no force was used against the defendant by either himself or his partner, Spangelo. He also denied that Alexander was ever taken down into the basement.

The allegedly involuntary confession was obtained from Alexander about 3:00 or 3:30 p. m., according to officers Spangelo and Hein. The arrest slip, however, shows the time of the arrest at 5:15 p. m. Spangelo claimed this was when the slip was made out, not when the arrest was made. Both officers believed the defendant was transported from the station at seven or eight o'clock that evening.

Officer Saxon was on duty on January 1, 1966, from four o'clock in the afternoon until twelve midnight. He recalled picking up some prisoners at the Area 1 police station and transporting them down to the central police station at 11th and State streets. Officer Saxon did not remember defendant Alexander, nor did he remember whether or not Alexander had any blood on his face. The

115

only thing the officer remembered is that one of the prisoners complained about his arm and although there were doctors at the central police station, the officer stopped at Provident Hospital. The officer testified that generally if a prisoner complains of being sick, ill, or hurt, he is taken to a hospital. If not, the lockup keeper will not accept the prisoners and the officers would have to take them back to a hospital.

Officer Smith was working the squadrol with officer Saxon on New Year's Day, 1966. He remembered Alexander and having transported him to Provident Hospital. He did not notice anything unusual about Alexander at that time and recalled that Alexander had banged against the window to get his attention and asked to be taken to a hospital because his arm was hurting. Alexander was handcuffed and taken into the hospital. About ten minutes elapsed before he emerged, but officer Smith did not recall seeing any bandages on his head, nor did he know what medical attention was given to Alexander at the hospital.

The testimony of the four officers was all of the evidence produced by the State with respect to the motion to suppress the confession. Defendant introduced the testimony of a codefendant, George Reynolds, the record librarian from Provident Hospital, the doctor who treated Alexander at Provident Hospital, the Inmate's Record from Cook County Jail and his own testimony. Reynolds testified that he thought he was arrested at about one o'clock and taken to the police station around one-thirty. He was kept in a detention room for about four or five hours and at about eight or nine o'clock in the evening, officer Spangelo took him down to the basement, handcuffed him behind his back and asked him if he had anything to do with the robbery. When Reynolds said no, the officer beat him. At about eleven o'clock he was transported from the station with Fred Alexander. His description of Alexander was that his nose looked like it

was broken and his lip was puffed. Reynolds could not remember whether it was Alexander's right or left eye, but there was a scar over the eye and both his eye and mouth were bleeding. After stopping at Provident Hospital, Alexander returned to the squadrol with a patch over the eye.

The record librarian of Provident Hospital produced a "Report Of Emergency Case" which showed that Fred Alexander was brought into the hospital at 10:55 p. m., on January 1, 1966. The hospital report showed "laceration forearm" and "laceration of temple (Pt is a prisoner)." The report was signed by Dr. Nazon.

Dr. Nazon remembered seeing Alexander on the evening of January 1, 1966, in the Provident Hospital emergency room. He did not remember the officer who brought Alexander in, but he did remember that policemen brought him into the hospital. The doctor recalled that the statement "laceration forearm" was incorrect and should have read "laceration forehead." He cleaned and sutured the wound on the forehead, but could not remember whether it was the right or left side. This was the only injury Dr. Nazon remembered. On the doctor's report it stated "Treatment: C & S plus T T." The doctor explained that this meant clinic, suture and toxoid.

When Alexander was admitted to Cook County Jail, an "Inmate's Record" was prepared. On the second page of the Inmate's Record there is a physical chart on which the intake clerk drew a circle on the skeletal figure on the chart and wrote "cut on left cheek." A second circle was drawn around the right eye and he wrote "hemorrhage in the rt. eye—bad."

Alexander took the stand on his own behalf and testified that he was arrested at about five o'clock in the evening on January 1, 1966. He was taken to the police station about five-thirty and handcuffed to a chair. He denied being advised of his rights and said that he was asked a few questions and then left alone for about three

117

hours. At about eight-thirty or nine o'clock he was taken downstairs to the basement of the police station. Officer Spangelo and two other officers started asking him questions about the robberies. When he said he did not know anything, they hit him in the nose and he fell to the ground. He could see blood gushing out of his nose. As he tried to get back up one of the officers kicked him and they continued to ask him questions and beat him. Alexander thought he passed out for a little while, but when he came to, the questions began all over again. He did not know how much time had passed while the beating was going on. He was hit several times by the officers with a police stick and with their fists. His eye was hit so hard that he could not see clearly for a couple of weeks.

Alexander further testified that after they hit him for a while they took him over to a water fountain and held his head down in a sink half full of water. This was repeated three or four times. At this point Alexander said yes to everything they asked him.

He described the basement of the police station as having about a six-foot high ceiling with pillars in it. The heating unit and fire extinguishers were down there as well as some lockers and a sink.

Alexander believed it was about 11:00 p. m. when the officers transported him from the police station. He remembered officer Smith who took him to Provident Hospital where his eye was stitched up. During the entire time that this was going on, Alexander was handcuffed and while the beating was being administered his hands were linked through his belt behind his back. When he arrived at 11th and State his lip was pretty well puffed out, as well as his eye, and his wrist was swollen up. He was treated in the County Jail clinic for approximately two weeks.

Alexander never signed a written statement confessing to the two robberies involved. The confession was made

118

orally to the police officers. He and Reynolds subsequently led the officers to the roof of the apartment building where Alexander lived. On the roof, the police recovered a 9-millimeter Luger pistol which, upon analysis by the crime laboratory, was determined to be the weapon used in the two robberies. The weapon belonged to Reynolds and according to the stipulation, he was the one who fired the pistol.

Not one of the victims of the two robbery incidents made an eyewitness identification of Alexander. The only evidence against Alexander was his confession and the subsequent recovery of the pistol. In its brief, the State admits that the only evidence, other than the confession, linking Alexander to the crime is the fact that he, along with Reynolds, led the officers to the weapon which was hidden on the roof of the apartment building.

 The constitutional test for the admission of a confession in evidence is whether the confession was made freely, voluntarily and without compulsion or abuse of any sort. A confession obtained by force or brutality is not voluntary and not admissible. In addition to the issue of brutality, the lack of counsel is a factor to be considered in determining the voluntary nature of a confession. This is true even though the standard of Miranda v. Arizona, 384 US 436 (1966) is not applicable to the instant case since the arrest and trial occurred prior to June 13, 1966. (Johnson v. New Jersey, 384 US 719 (1966).) Furthermore, it is an established rule that where an accused suffers injuries while in police custody, clear and convincing proof is required to establish that injuries were not the result of police brutality. People v. Davis, 35 Ill2d 202, 206, 220 NE2d 222 (1966) and cases cited therein.

 The State acknowledges the existence of the standard as set forth in Davis, but presents a two-prong reply. First, they argue that the testimony of the police officers is clear and convincing proof that no brutality

was visited upon the defendant. Referring to the medical report of Provident Hospital, it argues that a minor laceration on the forehead which was sutured, with no other apparent injuries, shows a lack of brutality and therefore the case boiled down to a question of credibility between the story told by Alexander and the testimony of the police officers. We cannot agree with this argument. A laceration on the forehead requiring a doctor to clean it out, apply a toxoid and suture cannot be classified as a minor injury. Furthermore, Alexander's admittance record to County Jail indicates a cut on the left cheek and hemorrhage in the right eye which the admitting officer designated as "bad." The testimony of the police officers that they do not remember Alexander bleeding on or about the face and their denial that he was taken down to the basement of the police station and beaten does not constitute clear and convincing evidence sufficient to counteract the medical report of Provident Hospital and the admitting sheet from Cook County Jail, as well as all the other corroborating evidence.

The State, however, adopts an alternative position. They argue that the brutality occurred after the confession was given to the police. Thus, any such brutality would in no way affect the voluntariness of a confession already given. The basis of this argument, of course, is the difference in the hours at which the police claimed they arrested and interrogated the defendant as opposed to the defense testimony concerning the times at which the incidents occurred. It is impossible for us to believe that the police officers brutally beat Alexander after having obtained a confession from him. If this were true, why did he subsequently lead the officers to the pistol? Alexander was taken to Provident Hospital at approximately eleven o'clock in the evening, and the arrest sheet showed that he was arrested at five o'clock in the afternoon. This would strongly tend to corroborate the defense version of the incidents on New Year's day, 1966,

120

more than the hours testified to by the police officers. It is of further significance that the two arresting officers, Spangelo and Hein, testified that defendant left the Area 1 police station at about seven o'clock, or no later than eight o'clock in the evening. However, the hospital record shows that he did not arrive until 10:55 p. m. The proximity of the Area 1 police station and Provident Hospital would clearly negate the possibility of a three-hour ride. Furthermore, there is no evidence, let alone clear and convincing, that the injuries suffered by the defendant occurred subsequent to the giving of his confession.

A short quote from People v. Davis, supra, is particularly apropos:

"While the finding of the trial judge is entitled to great weight insofar as the credibility of the witness is concerned, a determination of the issue here does not rest upon a question of credibility. The undisputed evidence shows that the defendant was injured while he was in police custody and the injuries were not explained by the State; that the defendant was held in police custody for a week without a hearing; that he was without counsel. In our opinion the confession obtained under these circumstances was not voluntary and the trial judge erred in ruling that it was admissible." (P 207.)

While the instant case does not present a long period of incarceration without a hearing, we do have serious injuries adequately corroborated by an independent hospital and the Cook County jailer. In our opinion the confession obtained from Alexander was not voluntary and was erroneously held to be admissible.

█ Defendant stipulated that the pistol found on the roof of his home belonged to and was fired by Reynolds during the two robberies involved. No independent motion to suppress was made. However, the information

121

leading to the recovery of the pistol could only have resulted from the illegally obtained confession. As the Supreme Court pointed out in Rogers v. Richmond, 365 US 534 (1960), the standard of whether a confession is trustworthy or untrustworthy is no longer the test for determining its admissibility.

"Our decisions under that Amendment (Fourteenth) have made clear that convictions following the admission into evidence of confessions which are involuntary, i. e., the product of coercion, either physical or psychological, cannot stand. This is so not because such confessions are unlikely to be true but because the methods used to extract them offend an underlying principle in the enforcement of our criminal law: that ours is an accusatorial and not an inquisitorial system—a system in which the State must establish guilt by evidence independently and freely secured and may not by coercion prove its charge against an accused out of his own mouth. . . . Indeed, in many of the cases in which the command of the Due Process Clause has compelled us to reverse state convictions involving the use of confessions obtained by impermissible methods, independent corroborating evidence left little doubt of the truth of what the defendant had confessed. Despite such verification, confessions were found to be the product of constitutionally impermissible methods in their inducement. Since a defendant had been subjected to pressures to which, under our accusatorial system, an accused should not be subjected, we were constrained to find that the procedures leading to his conviction had failed to afford him that due process of law which the Fourteenth Amendment guarantees." (Pp 540–541.)

In People v. Ditson, 57 Cal2d 415, 20 Cal Rptr, 369 P2d 714 (1962), the California Supreme Court held:

". . . (T)he reason for the common-law rule permitting the introduction of *real evidence* discovered by means of an involuntary confession—that such evidence tends to prove the 'trustworthiness' of the confession—must now be deemed constitutionally indefensible, and hence that the rule itself must be abandoned. The inquiry should instead be directed to the issue of whether the introduction of the challenged evidence—the confession itself or its asserted product—in a criminal prosecution which culminated in a conviction denied the defendant, in the particular circumstances of that case, any essential element of a fair trial or due process of law." (P 727.)

In the recent case of People v. Raddatz, 91 Ill App2d 425, 235 NE2d 353 (1968), this court held that a confession "properly" obtained subsequent to obtaining a confession by improper methods was inadmissible and we sustained an order suppressing such second confession. Analogously use by the State of the "second confession" in the instant cause, i. e., defendant's knowledge of the location of the pistol, is also improper.

■ Since both the confession and the pistol are inadmissible there remains no evidence upon which to base a conviction under the two indictments. Even if we were to hold that the pistol was admissible into evidence, there was a failure on the part of the victims or witnesses to the robberies to identify Alexander and the pistol was found on the roof of an apartment building to which many persons had access. The pistol alone is insufficient to sustain the conviction. The reasonable doubt arising from this meager evidence against Alexander requires us to reverse his conviction without remanding for a new trial.

Judgment reversed.

BURMAN, P. J. and MURPHY, J., concur.