THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* DAVID L. WILSON, Defendant-Appellant.

(No. 57579;

First District (1st Division)—November 19, 1973.

*Rehearing denied January 4, 1974.*

Hugh C. Griffin, of Chicago (Lord, Bissell & Brook, of counsel), for appellant.

Bernard Carey, State's Attorney, of Chicago (Kenneth L. Gillis, Patricia C. Bobb, and John B. Adams, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE EGAN delivered the opinion of the court:

The defendant, David Wilson, was jointly indicted with Louis Haggans for murder, robbery and burglary. The defendant's motions to suppress his confessions and certain physical evidence were denied. After the jury had been selected, Haggans was severed, his case was nolle prossed, and he testified for the State. Wilson was found guilty by a jury of all the offenses charged and sentenced to concurrent terms of 50 to 100 years for murder, 10 to 20 years for burglary and 10 to 20 years for robbery.

The deceased, Joseph Martin Ellis, was 68 years old and had worked for the 12th Street Store in Chicago for 39 years. On August 24, 1970, he began work as a watchman at 11:30 P.M. He was wearing a uniform with a badge and was armed with a .38 caliber revolver. When employees were unable to enter the store the following morning, Isadore Shalowitz, the president of the store, was called, and he found the deceased "lying in a lake of blood." A pair of gold ribbed pants and a pair of work gloves were found near an open window at the rear of the store. Both the pants and the gloves were heavily stained with blood. A bent table knife was on a table in an area adjacent to the body. The deceased's wallet containing a registration certificate for the .38 caliber revolver was lying in an aisle. There was a ladder that led up to a window 11 feet from the floor. The outside screening around that win-

dow had been pulled away, and below it was a garbage can that had been turned upside down. Filing cabinets and the cash register were open. Two small portable television sets, a pair of green pants, and the deceased's revolver were missing. The pathological examination disclosed innumerable bruises extending from the pubic area upward, hemorrhaging in various parts of the body, fractures of the breastbone, three ribs and the skull, and various lacerations, including one of the brain. The cause of death was given as shock caused by severe trauma, most significantly, the trauma which caused the skull fracture and laceration of the brain. In the pathologist's opinion some of the bruises could have been caused by a hand or foot, but the appearance of the scalp and the left arm indicated that a "relatively narrow, heavy, long object had been used" on those portions of the body, and "that instrumentality was chiefly the cause of the death."

The defendant was taken into custody in the evening of August 25 on the corner of Roosevelt and Loomis when he could not produce an identification card. He was questioned at the Maxwell Street Station about the killing of Ellis, under circumstances to be discussed later, denied any knowledge of it, and was released at approximately 8:00 A.M. the following day, August 26. Two hours later he was again picked up by the police and taken to the Maxwell Street Station. He was questioned periodically and, after denying any knowledge of the crime from time to time, told the police officers he had stolen articles from the store and had taken them to his aunt's home. Later he made a statement, which he subsequently signed, to an Assistant State's Attorney in the presence of a shorthand reporter at 7:30 A.M., August 28. In that statement the defendant said that Haggans told him that he would like to "pick up a little stuff at the 12th Street Store"; they didn't know a guard was there when they pried the bars open with a 2 by 4; the defendant stood on a garbage can, and both entered the store through the window and were crawling around when they saw the guard; he grabbed the guard, and Haggans "stomped him"; at the time the defendant was wearing tennis shoes and Haggans was wearing "hard shoes"; Haggans stomped the man in the head a couple of times and Wilson kicked him once; he noticed that he had blood all over his yellow corduroy pants, and he replaced them with a pair from the store; they took two television sets and the pair of pants he was wearing, but he never took or saw a gun that night; he sold one television set to "James," whose last name he did not know, and brought the other to his aunt's home; he committed the crime to get money for his narcotics habit.

Before this statement was made to the Assistant State's Attorney, the police went to the home of the defendant's aunt and recovered one of

the stolen television sets, a pair of blood stained gym shoes, and a pair of green wash pants. In the statement the defendant identified the shoes as his and the television set as one that he had taken.

The defendant first contends that all statements, written and oral, should have been suppressed, and, consequently, so should the articles recovered from his aunt's home.

At the hearing on the motion to suppress, the defendant, who suffered from epilepsy, testified as follows:

He was 24 years old, had gone to 10th grade in school, and had just gotten out of jail. He had been in the penitentiary. He was arrested by three plainclothes policemen at the corner of Roosevelt and Loomis on Tuesday evening, August 25, and taken to the Maxwell Street Police Station when he was unable to show any identification. He was questioned about the murder by a short, "baldy" plainclothes policeman who smoked big cigars and whose name he did not know. After he told the officer he knew nothing about the crime, the officer threw him a gun and said he was going to shoot him for trying to grab his weapon. He started beating Wilson on the left shoulder and kicking him "between [his] legs." He was questioned until about 11:00 P.M. Then he remained alone until 8 o'clock the following morning when he asked another plainclothes officer if he could go home; he was told that he could, and he left. When he asked the short officer if he could make a phone call, there was no answer. At no time was he given anything to eat. When he got to his aunt's home he had his arm bandaged and then went to the Public Aid Office where he was picked up by Officer Denson and taken back to the Maxwell Street Station.

He sat in a small room with a Captain and Officer Finnelly, who tried to stick some electric wires in his mouth. Finnelly said he was going to give Wilson some kind of "truth serum shock" and that it would electrocute him if he told a lie. While Finnelly was trying to put the device in his mouth, some more policemen came in and tried to hold him. Later he was questioned by Brodersen and Finnelly, who refused to let him use a phone. From then until the morning of August 28 he was questioned by relays of police officers, who beat and kicked him. At one point he was suspended from a window by handcuffs for about an hour and a half. He continued to deny any part in the murder. Haggans was brought in and beaten, and the defendant was told Haggans had made a statement to the effect that he and the defendant had committed the murder. During all the time he was at the police station, he never had a chance to sleep and was given nothing to eat. He told them he might have gotten some of the goods from the store, but he was not guilty of killing the man. After his cousin, Jessie Lee Taylor, was brought to

the station, they beat him and sent him in to tell the defendant to sign a statement. They said they were going to get his grandmother and brother and beat them too. He asked Brodersen to leave his family alone, but Brodersen said he would have to sign a statement. When the Assistant State's Attorney came in with Brodersen, the defendant begged the Assistant State's Attorney to talk to him alone. The Assistant told him, if he was not going to sign the papers, they had nothing to talk about and left the room. When Brodersen threatened him again, he called the Assistant State's Attorney back and made the statement.

Wesley Brodersen, the Sergeant in charge of the investigation, testified he first saw the defendant on August 28 at 4:30 or 5:00 P.M. Investigators Higgins, Finnelly and possibly Anderson were present when he asked the defendant certain questions and received answers; some were recorded and some were not. He was present when Mr. Montemurro, the Assistant State's Attorney, questioned the defendant on the morning of the 29th. Brodersen had several conversations with the defendant on August 28 and 29, and he knew that several others had questioned the defendant at various times. During his first conversation with the defendant he informed him of his rights and the defendant stated that he understood them. When he first saw him, the defendant's physical condition was the same as it was in court. He saw no one hit or beat the defendant, nor did he see any officers handcuff him to a screen. On cross-examination he testified that on August 25 he was assigned to the 3:00 P.M. to 11:00 P.M. shift. He could not recall if he was at the station on the 26th of August. He did not recall if he was working on the 27th of August. He did not know if he had ever seen the defendant before the 28th of August. He thought the defendant had been in custody for a couple of hours before he had questioned him. He could not say for sure whether anyone questioned him before he did. He did not ask the defendant if he wanted to make a phone call, and he did not know if he had made any phone calls after he was arrested. He did not write anything down when he questioned him, and he did not recall if the defendant answered all of the questions that were asked. After he first questioned the defendant, he was present on about seven or eight occasions when the defendant was interrogated by others. The other officers were asking the defendant some of the same things he had already asked him. He did not know if the defendant gave them different answers than he had given him. He was present when the Assistant State's Attorney questioned the defendant at seven in the morning on August 29. The defendant had been allowed to contact his aunt and his cousin as of seven o'clock in the morning of the 29th. The defendant was allowed to talk to his aunt in private without a police officer being present. He

did not strip the defendant of his clothing to see if he had been injured.

Investigator Lee Anderson testified that he was working with Sergeant Brodersen and Investigators Finnelly and Shine. The first time he saw the defendant was on August 27 at about 11:45 P.M. Before questioning him he warned the defendant of his rights. He was present with Sergeant Brodersen when Mr. Montemurro questioned the defendant. From the first time he met the defendant until August 28 at 7:25 A.M., he was in his presence for about eight hours. During that time he did not kick or beat the defendant nor did he see any of his fellow officers kick or beat him. He did not recall the defendant being unconscious, and he did not see any marks or blood on his body. On cross-examination he testified that when he saw the defendant he did not determine how long he had been in custody. When he first questioned him he did not recall if he had been charged. He was not sure if the defendant had been questioned before he questioned him. He talked to him again some time before seven o'clock the next morning. He did not recall talking to him at any other time before seven o'clock in the morning. He did not remember any part of the second conversation he had with the defendant.

Anthony Montemurro, an Assistant State's Attorney, testified that, before questioning the defendant in the presence of Sergeant Brodersen and Detective Anderson and the shorthand reporter, he advised him of his rights by reading them from a card. He later saw him at about 9:00 A.M. that morning, at which time the defendant initialed each page and signed the last page of the statement. On cross-examination he testified that he spoke to him alone for two or three minutes. He asked him if he wanted to see an attorney, and he said he did not. After the shorthand reporter was called to write down the questions and answers, Montemurro told him that if he lacked the financial ability to retain a lawyer, a lawyer would be appointed to represent him before any questioning and that he had the right to have the appointed lawyer present with him during the questioning. The defendant answered that he understood, but added: "I don't have money to hire a lawyer, I don't think." Before beginning the questioning, Montemurro determined that the defendant had been in custody for approximately 17 or 18 hours.

Investigator Anthony Finnelly testified that he personally had one or two conversations with the defendant, the first of which was in the early evening of August 28 and lasted no longer than 15 minutes. Before he questioned him, he determined that he had already been given his constitutional rights. The second conversation took place 30 or 40 minutes after the first, and it lasted about 10 or 15 minutes. He did not, nor did he see any other officers, kick or beat the defendant. The defendant did

not ask him to obtain a lawyer. He did not tell the defendant that he could make a phone call.

Investigator Francis Higgins, testified that he first saw the defendant on August 28 after 4:00 P.M. He observed him for about 10 hours. During that time he saw no one beat, kick or injure him. At the time, Higgins had a police report concerning the investigation which showed that the defendant had been brought in for the first time on August 26, released on the 27th and brought in again on the 28th. The defendant was charged with murder on the morning of the 28th but was not taken before Judge Sulski until the following morning.

The defendant was examined on August 29 by Lubra Chambers, a clerk at the County Jail, who made out a medical report. The defendant had a head wound which required immediate medical attention since blood was seeping through the bandage and several body wounds which Chambers indicated on the report were located in the area of both kidneys and the left side of the abdomen. His left shoulder was cut and covered by a gauze wrap-around bandage. The defendant told Chambers that he had been beaten by the police.

■■■ The defendant's principal contention is that his confessions were improperly admitted. The question is whether the confessions were voluntary, and the answer "depends not upon any one factor, but upon the totality of all the relevant circumstances." (*People v. Nemke*, 23 Ill.2d 591, 600, 179 N.E.2d 825.) The burden is on the State to prove voluntariness, but not beyond a reasonable doubt, and the decision of the trial court will not be disturbed unless it is manifestly against the weight of the evidence. *People v. Weger*, 25 Ill.2d 370, 373-374, 185 N.E.2d 183.

The unrebutted testimony of the defendant shows that he was illegally arrested on August 25, illegally detained overnight, and beaten and threatened by the police. No charge was ever lodged against him, and he was released. The State made no attempt to explain what appears to be a grossly improper procedure, nor even to identify the short officer who was charged by the defendant with criminal acts nor to negate his existence. Similarly, the State made no attempt to show what was happening to the defendant from the time he was arrested in the morning of the 26th by Officer Denson, who did not testify, until 30 hours later at 4:30 P.M. on August 27. (At this juncture we point out that Sergeant Brodersen and Investigators Finnelly and Higgins were in error when they testified that they first saw the defendant in the afternoon or evening of August 28 since the confession was taken by the Assistant State's Attorney on the morning of August 28. We assume they meant August 27.) The defendant's testimony that he was given nothing to eat and had no sleep is also unrebutted, as was his testimony that his

cousin and Haggans were beaten. The conclusion is inescapable that the defendant was interrogated by relays of police officers in the face of repeated denials. The Assistant State's Attorney erroneously believed that the defendant had been in custody for 17 or 18 hours, rather than for a total of more than two days.

■■ The evidence, therefore, clearly shows illegal detention for a long period of time, a fact which by itself does not necessarily render a confession inadmissible but which must be considered. (*People v. La Frana,* 4 Ill.2d 261, 266, 122 N.E.2d 583.) It shows extended incommunicado questioning, condemned as inherently coercive in *Ashcraft v. Tennessee,* 322 U.S. 143, 88 L.Ed. 1192. (See also *People v. Goldblatt,* 383 Ill. 176, 49 N.E.2d 36; *People v. Vinci,* 295 Ill. 419, 129 N.E. 193.) It shows a violation of the criminal code which provides that "persons in custody shall be * * * provided * * * food." (Ill. Rev. Stat. 1971, ch. 38, sec. 103—2(c); see *People v. Jones,* 402 Ill. 231, 235, 83 N.E.2d 579.) It shows beatings and threats on August 25. And if there be any doubt that these facts, so damaging to the State's position, do not tip the scales in favor of the defendant, the addition of proof into the balance that the defendant suffered injury while in police custody must surely do so. The officers denied that the defendant received his injuries at police hands, but, as was said in *People v. La Frana,* 4 Ill.2d 261, 267, 122 N.E.2d 583:

> "Where the only evidence of coercion is the defendant's own testimony, and where this is contradicted by witnesses for the People, then of course the trial court may choose to believe the later, and our recognition of the superior position of the trial court to evaluate the credibility of the witnesses before it makes us reluctant to reverse its determination. [Citations.] But where it is conceded, or clearly established, that the defendant received injuries while in police custody, and the only issue is how and why they were inflicted, we have held that something more than a mere denial by the police of coercion is required. Under such circumstances the burden of establishing that the injuries were not administered in order to obtain the confession, can be met only by clear and convincing testimony as to the manner of their occurrence. See *People v. Thomlison,* 400 Ill. 555."

Sergeant Brodersen, the man in charge of the investigation, could not recall if he was in the station on August 26 or 27. He did not know if he had seen the defendant before the 28th. He did not know whether anyone questioned the defendant before he did, and it was his "idea" that "he had been in custody probably a couple of hours." (Yet Higgins, his subordinate, had a police report on August 28 which showed that the defendant had been arrested on August 26, released and re-arrested.)

Investigator Anderson also did not know how long the defendant had been in custody when he first questioned him or if he had been charged. He did not recall the defendant being unconscious, and he did not remember any part of the second conversation with the defendant. The Assistant State's Attorney, Anthony Montemurro, testified that he had a picture taken of the defendant, and he examined only the defendant's arms. The picture was never produced.

■■ The evidence falls far short of the clear and convincing proof required to show that the injuries were not administered by the police, and we are not persuaded otherwise by the suggestion that he might have received them in an epileptic seizure. For these reasons, we judge that all confessions, oral or written, should not have been admitted (see *People v. Davis*, 35 Ill.2d 202, 220 N.E.2d 222); nor should the television set, gloves, and pants recovered from his aunt's home, since their recovery stems from information illegally obtained from the defendant. *People v. Alexander*, 96 Ill.App.2d 113, 238 N.E.2d 168.

In view of our determination of this question, we need not decide whether the defendant knowingly waived his rights under *Miranda v. Arizona*, 384 U.S. 436, 16 L.Ed.2d 694, 86 S.Ct. 1602, or whether inadmissible hearsay evidence was introduced to show what had induced the defendant to confess.

After the jury had been selected to try both Haggans and the defendant, Haggans' case was severed, and he testified for the State. His testimony is as follows: When he saw the defendant sortly after midnight, August 25 at 1302 West Maxwell, the defendant asked him and a couple of other people, including Claude Lee, if anyone owned a car. Claude had a car, and the defendant asked him to take some things to the west side. Haggans next saw the defendant about 10 minutes later near the 12th Street Store with Claude and Cleveland Lee. They were putting some television sets and a box of clothing into the trunk of Claude's car. Haggans went through the window into the store, but he did not see the defendant go into the store. (Curiously, neither side asked him what occurred after he entered the store.) He was arrested on August 27, 1970, and was still in custody on the day of the trial, January 19, 1971.

■■ The defendant was not permitted to show that the case against Haggans had been nolle prossed before he testified and assigns this ruling as error. The defendant's testimony corroborated the testimony of Haggans. Under these circumstances we would hold the ruling to be harmless error. Since we have determined, however, that a new trial is required, we judge, if Haggans testifies, that the jury may be apprised of the disposition of his case.

■■ The defendant contends that his convictions of all three charges

must be reversed because of admission of the improper evidence. We agree that the convictions of murder and robbery must be remanded for a new trial, but we believe that the conviction of burglary should stand.

The defendant testified before the jury that he was walking down Maxwell Street shortly after midnight on August 25, 1970. He was wearing yellow corduroy slacks and walked to Newberry and Maxwell to get some dope. He met a man named Jerry Eaton, whom he had known before. Eaton gave him some dope and told him he could get some merchandise to pay for it from a store on the corner of 14th Street. The defendant went to an alley behind the store, turned over a garbage can, and climbed into the store through a window. There was no one with him at the time. When he got inside he went down an aisle and fell in some blood. At that time he saw a man's leg sticking out from another aisle. He became frightened and ran toward the back to get out. The window was too high, and he got a ladder and began to climb out. When he noticed blood on his pants, he got down off the ladder and took a pair of pants from a table. Before he left he went back up front and got a pistol from the pants of the deceased and two television sets. He put the pistol in his pocket and carried the television sets up the ladder and out of the store. He went back to Newberry and Maxwell and told Jerry Eaton that he wouldn't have gone into the store if he had known that a man was in there. He then talked to Claude Lee about transporting some "stuff" to the west side. He asked Haggans about a car, and when Haggans told him he did not have one the defendant talked to Claude Lee, then got in the car and went around to 14th Street. Haggans asked him how he got in, and he told him through the window. The defendant took the two television sets, a box of clothes, pants and gun. He sold one of the television sets to James Barking. The other things he took to his aunt's home.

In our view, this testimony of the defendant constitutes a judicial confession of burglary.

The defendant relies on *Harrison v. United States* (1968), 392 U.S. 219, 20 L.Ed.2d 1047, 88 S.Ct. 2008. The defendant there was tried and convicted upon a charge of felony murder. A Court of Appeals reversed the conviction because three illegally obtained confessions had been introduced against him. After the admission of these confessions, the defendant took the stand and gave testimony in which he admitted being at the decedent's house with a gun on the night of the murder. On retrial, the prosecution read this prior testimony into evidence, and the defendant was again convicted. The Supreme Court, in a six to three decision, reversed the conviction stating at pages 222-223:

"[T]he petitioner testified only after the Government had illegally

introduced into evidence three confessions, all wrongfully obtained, and the same principle that prohibits the use of confessions so procured also prohibits the use of any testimony impelled thereby—the fruits of the poisonous tree, to invoke a time-worn metaphor.

\* \* \*

In concluding that the petitioner's prior testimony could be used against him without regard to the confessions that had been introduced in evidence before he testified, the Court of Appeals relied on the fact that the petitioner had 'made a conscious tactical decision to seek acquittal by taking the stand after [his] in-custody statements had been let in \* \* \*.' But that observation is beside the point. The question is not *whether* the petitioner made a knowing decision to testify, but *why*."

We judge that *Harrison* is inapplicable to this case for a number of reasons. The facts of *Harrison* are recited in the first reversal (359 F.2d 214). The victim answered a knock on his door and was met by a blast from a sawed-off shotgun fired by Harrison in a robbery attempt with two other men, as the later confession disclosed. An eyewitness saw two boys, not later identified, coming out of the victim's house and one put a gun under his coat. Another witness had had breakfast with the victim about a half hour before the killing and saw a man looking at him and the victim. That man, later identified as the co-defendant Sampson, left the restaurant and got into a car with the two other men. The testimony of these two witnesses, in addition to the confessions, constituted the only evidence against the defendant and, it is apparent, was insufficient, standing alone, to support a conviction of Harrison.

In this case, James Barking testified that he saw the defendant in the early morning of August 25 with two television sets chained together, and he bought one for $30. The defendant wanted to shoot the chain off with a .38 caliber pistol he had stuck in his waistband but later separated the sets with a screwdriver. The defendant went into his aunt's home twice, and the last time he came out he did not have the gun. (We note that the stolen gun was never recovered.) The defendant's gym shoes had blood on them. The television set Barking bought was turned over to the police and was one of the two that were stolen from the store.

Claude Lee and Cleveland Lee testified that the defendant directed them in Claude's car to a vacant lot near the 12th Street Store where he put two television sets and a box in the trunk, and Claude Lee drove to Roosevelt and Loomis where the defendant sold one of the television sets to James Barking. The defendant had a revolver at the time. After

Claude Lee testified that he went to the police station, he was cross-examined as follows:

"DEFENSE ATTORNEY: Q. All right. And while you were there did you see David Wilson?

A. Yes, I did.

Q. They brought you into the same room as him, did they not?

A. Yes.

\* \* \*

Q. And when you accused him to his face Mr. Wilson said that he had, in fact, been with you and had the television sets, didn't he?

A. Yes.

STATE'S ATTORNEY: Objection to what Mr. Wilson said to the witness.

DEFENSE ATTORNEY: They have been calling a lot of other witnesses as to what he said.

THE COURT: Overruled; he may answer.

DEFENSE ATTORNEY: Q. Did Mr. Wilson admit that he had in fact used your car to transport the television sets?

A. Yes."

The cross-examination of both Claude and Cleveland Lee discloses an attempt to establish with both witnesses that the defendant had admitted stealing the television sets but denied killing the guard.

Unlike the facts of *Harrison,* the testimony of Haggans, Barking, Claude Lee, and Cleveland Lee would be sufficient to establish the guilt of the defendant of the crime of burglary.

In *Harrison,* in his opening statement the defendant's attorney told the jury the defendant would not testify. Many of the matters referred to in the opening statement by the defense attorney in this case could be proved only by the defendant. Moreover, in closing argument, the defendant's attorney said:

"It seems to me that there is only one issue in this case, and that is whether or not the prosecution has convinced you beyond a reasonable doubt that David Wilson in fact murdered Martin Ellis on the morning in question.

To make that determination you must decide two things: Number one, does the evidence that you have heard fairly support the prosecution's theory of the case? The prosecution's theory of the case is that Louis Haggans and David Wilson, acting in concert, entered the 12th Street Store some time early that morning and, in fact, burglarized the store, robbed Mr. Ellis and murdered him. That is their theory.

Now, Mr. Wilson has pleaded not guilty to this indictment which charges him jointly with the crimes of robbery, burglary, and murder. The prosecution, by bringing these charges together, has required Mr. Wilson to stand trial if he desires to plead not guilty on the charge of murder.

*I think you can understand from his testimony what his testimony is regarding the charge of burglary.* But the point is that this case and the reason you have had to hear all this evidence is because the prosecution has put Mr. Wilson in the position of defending himself on all these charges—all or nothing at all. *If you don't want to plead guilty and confess to all these charges, then you must stand trial for all of them.*

\* \* \*

But let me say this. The evidence in this case shows you that the Police could in fact have garnered and discovered all the proof that they presented in this case and they had some fifteen, some, odd witnesses that they called here. Seems to me that all of the proof *at least on the burglary charge* without respect to the murder could have been secured without these violations to Mr. Wilson's rights. They could have found these witnesses with ordinary, hard, diligent police work.

\* \* \*

So, what I am saying is, and the State's Attorney has well proved that, my client is a liar. He lied when they took him in on this case and denied that he had committed anything. They have proven that. And they have proven that he was a burglar in the past. *They might have proven that he is a burglar now.*" (Emphasis added.)

During the prosecutor's closing argument there was no objection made to the following:

"And based upon their testimony which testimony the defendant apparently concedes, we not only. proved beyond a reasonable doubt, but we proved to a certainty a basis and standard which we are not required, to certainty that this defendant perpetrated a burglary of the 12th Street Store. And he won't argue that point. He won't argue the point that he was in the store. No."

We believe that *People v. Heirens*, 4 Ill.2d 131, 141, 122 N.E.2d 231 provides analogous authority to support an affirmance of the burglary conviction. In that case the defendant had pleaded guilty to murder. He alleged and proved in a post-conviction hearing that his constitutional rights had been violated while in police custody. The court said:

"Of course the search of petitioner's living quarters, the inces-

sant and prolonged questioning of petitioner while he was confined to a hospital bed, and the unauthorized use of sodium pentothal and a lie detector, were flagrant violations of his rights. Such conduct on the part of law enforcement officials deserves the severest condemnation, especially in view of petitioner's age and emotional instability, and any conviction obtained as a result of such practices would violate constitutional guaranties of due process of law. If either a confession or a plea of guilty is caused by illegal and coercive conduct on the part of law-enforcement officials, the conviction cannot stand. [Citation.] But the issue here is whether the pleas are attributable to the conduct in question. If it is reasonably found that there is no relationship of cause and effect, the fact that illegal acts were committed in order to extract information or confessions from the accused does not warrant setting aside the conviction. [Citation.]"

We judge that the defendant's judicial confession to the charge of burglary was not induced or compelled by the admission of the illegally obtained confession but rather by the testimony of Haggans, Claude and Cleveland Lee, and particularly of Barking, who was able to produce, and connect the defendant with, the stolen merchandise.

The defendant has also cited two cases from Federal District Court and one from the Circuit Court of Appeals. They are all factually inapposite. Further, we are not bound by decisions of any federal court other than the Supreme Court. *City of Chicago v. Loitz,* 11 Ill.App.3d 42, 47, 295 N.E.2d 478; *People v. Battiste,* 133 Ill.App.2d 62, 272 N.E.2d 808.

■■ Burglary is now a Class 2 felony (Ill. Rev. Stat. 1973, ch. 38, sec. 19—1(b).) and as such is subject to a minimum term of one year and a maximum term of 20 years. (Ch. 38, sec. 1005—8—1(b)(3).) The minimum term, however, shall not be greater than one-third of the maximum. (Ch. 38, sec. 1005—8—1(c)(3).) Since this case has not reached the stage of final adjudication, the sentence of burglary is now subject to the Unified Code of Corrections and is modified to a minimum term of 6 years and 8 months and a maximum term of 20 years.

For the foregoing reasons, the judgments of conviction of murder and robbery are reversed and the cause remanded for a new trial; the conviction of burglary is affirmed as modified.

Judgments reversed and cause remanded in part and affirmed in part as modified.

BURKE, P. J., and GOLDBERG, J., concur.