THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
MARK LANGLO, Defendant-Appellant.

Second District   No. 85—0771

Opinion filed March 19, 1987.—Rehearing denied April 24, 1987.

G. Joseph Weller and Kathleen J. Hamill, both of State Appellate Defender's Office, of Elgin, for appellant.

Robert J. Morrow, State's Attorney, of Geneva (William L. Browers and Marshall M. Stevens, both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

PRESIDING JUSTICE LINDBERG delivered the opinion of the court:

■ Defendant, Mark Langlo, was charged by indictment with one count of arson (Ill. Rev. Stat. 1985, ch. 38, par. 20—1(a)) and one count of aggravated arson (Ill. Rev. Stat. 1985, ch. 38, par. 20—1.1(a)). Following a bench trial, he was convicted on both counts and sentenced to serve 12 years' imprisonment for aggravated arson and an extended term of 9 years for arson. On appeal, defendant raises several issues relating to the aggravated-arson conviction. Given the Illinois Supreme Court's decision in *People v. Johnson* (1986), 114 Ill. 2d 69, 499 N.E.2d 470, that section 20—1.1(a)(1) (Ill. Rev. Stat. 1985, ch. 38, par. 20—1.1(a)(1)) is unconstitutional, we need not address these issues. The only remaining issue is whether the court erred in denying defendant's motion to suppress. We reverse and remand.

The charges against defendant stemmed from a fire on the morning of March 15, 1985, which destroyed a boat mounted on a trailer in the complainant's driveway. The trailer was parked about 3 feet from the complainant's house, which suffered some smoke and heat damage. After the fire was put out, the complainant observed two empty beer glasses and some footprints in the front yard which had not been there the previous evening. The police were alerted to this fact.

Defendant filed a pretrial motion to suppress statements he made to Carpentersville police officers on the night of March 20 to 21, 1985. The motion asserted that his statement had been elicited subsequent to an illegal arrest without probable cause and, therefore, the statements should be suppressed. At the hearing held on this motion, defendant testified that on the evening of March 20, 1985, he went to P.M. Bentley's, a tavern in Carpentersville. Defendant further testified that throughout the evening he had consumed 18 cans and 2 glasses of beer. Around midnight defendant was approached by Carpentersville police detective, Robert Wiggins, who asked defendant to accompany him to the police station. According to defendant, the officer stated: "If you don't come down now, I will just arrest you right here." Defendant further testified that the officer did not tell him he was under arrest, but that he did not believe that he could

refuse to go with the officer, or that he had a choice. Defendant left Bentley's with Officer Wiggins and walked out to the parking lot where they were met by another officer who, unlike Wiggins, was in uniform and was in a squad car. The uniformed officer asked defendant to get into the squad car. According to defendant, he was not given a choice whether he wanted to drive himself to the station. Defendant got into the back seat of the squad car, which automatically locks from the outside. Defendant was driven to the police station, where he was taken to an interrogation room and given his *Miranda* rights, which he waived. Defendant testified that during the three hours he spent in the interrogation room, he was not left alone at any time and was continuously questioned by two detectives and a uniformed officer. He further testified to the following:

### DIRECT EXAMINATION

"Q. [Counsel for Defendant]: During the time that you were being asked questions by the officers, did any officer ever tell you that you could leave the police station?

A. [Defendant]: No.

Q. Did you ever ask to leave the police station?

A. I asked if I was under arrest.

Q. When did you ask that?

A. After—around 20 minutes after they questioned me.

Q. Did anyone give you a response?

A. Yes.

Q. Do you know which officer it was?

A. It was the officer that picked me up inside the bar, the detective.

Q. The detective. What did he say to you?

A. He said I was under arrest.''

### REDIRECT EXAMINATION

Q. Were you told—You said you were told at some point you were under arrest?

A. Yes.

Q. Were you told you were under arrest *before or after you had indicated any type of involvement* in the incident you are charged with here?

A. *After.*

Q. About how long was that?

A. *After about the first 25 minutes after getting there.*

### RE-CROSS-EXAMINATION

Q. [Assistant State's Attorney]: First you made a statement to the police indicating your involvement and then you were

told you were under arrest; correct?

A. Yes." (Emphasis added.)

Officer Wiggins also testified at the hearing to essentially the same sequence of events. He stated that defendant became a suspect in the arson investigation when the owner of Bentley's informed the officer that the night of the incident defendant had been drinking all night. Detective Wiggins was familiar with defendant, since he had investigated defendant in connection with a 1980 arson which led to defendant's conviction for that offense. The officer did not attempt to contact defendant at home but asked the bar owner to call him the next time defendant came into the bar. On the evening of March 20, 1985, defendant was again seen at Bentley's, and the bar owner called the police, who, in turn, called Wiggins at home regarding this information. Wiggins drove to the bar in his own car, but a squad car was dispatched to the bar's parking lot as well.

The officer testified that he informed defendant of the pending investigation and asked him to come down to the station to talk about the incident. When defendant asked Wiggins whether he was under arrest, the officer answered: "No, we just want to talk to you about this incident." The officer also stated that he did not threaten defendant with arrest for refusing to go to the police station. Wiggins further testified, contrary to defendant's testimony, that defendant was offered a choice regarding which car he wanted to ride in to the station. According to the officer, defendant opted for the squad car. Wiggins testified that defendant was not handcuffed at any time. After a period of investigation lasting for 2 hours and 45 minutes, defendant made the incriminating statements regarding his involvement in setting the fire. He further testified to the following:

"[Assistant State's Attorney]: When was the very first time, Officer, you told the defendant he was under arrest?

A. It was approximately somewhere in the area of 3:30 a.m. in the morning.

Q. Was this before or after he had admitted to you his involvement in the arson?

A. After.

Q. Did you ever, at any time, state to him before 3:30 in the morning that he was under arrest?

A. No, sir.

Q. Did you ever, at any time, while you were at P.M. Bentley say to him if he did not come with you to the police station, you would arrest him anyway?

A. No.

In a written order denying the motion to suppress, the trial court made the following findings:

"1) During the course of an arson investigation, the Carpentersville police department, pursuant to clues they had developed focused on the defendant.

2) On March 21, 1985 for the purpose of securing a statement and other evidence, a police detective approached the defendant at a public place.

3) No force was used or threatened; and while the defendant claims he was told he would be arrested if he did not cooperate, it is more credible that the defendant merely acceded to the detective's request to answer some questions.

4) The detective explained the crime being investigated, stated what he wanted from the defendant and in answer to defendant's question told the defendant that he was not under arrest.

5) No mention, one way or another was made whether defendant had a choice to answer the questions or was free to go.

6) The defendant was driven by a uniformed officer in a marked squad car to the police station.

7) The defendant was taken to an interrogation room with which he was familiar from a previous experience.

8) The detective was joined in the interrogation room by at least one other officer.

9) The defendant was read and acknowledged his 'Miranda Warnings'.

10) At that time and for another two hours and forty-five minutes, when the defendant made incriminating statements, the police had no probable cause to arrest the defendant.

11) At that point just prior to the statements, under the accumulated circumstances, it might be concluded that the nature of the proceedings had been transformed from a mere investigatory stop to a situation in which a reasonable person could believe he was bound to remain in the presence of the police.

12) However, the principles of *People v. Finklea* 119IA3448, by which this court is bound, hold otherwise."

Defendant's motion to suppress was denied. This appeal ensued.

On appeal, defendant contends that the trial court erred in denying defendant's motion to suppress. We conclude that the trial court's factual findings are not against the manifest weight of the evidence. However, based on our conclusion that the trial court misapplied our

decision in *People v. Finklea* (1983), 119 Ill. App. 3d 448, 456 N.E.2d 680, we find that the trial court erred in denying defendant's motion to suppress.

Defendant contends that he was seized without probable cause for the purpose of custodial questioning during an investigation of a crime. He further argues that if this detention is found to be violative of his fourth amendment rights to be free from unreasonable seizure, then the statements elicited from him during the interrogation were tainted with the illegality of the detention and, therefore, should be excluded from the evidence. The State, on the other hand, contends that since the record indicates that defendant's questioning had no indicia of arrest, defendant voluntarily made the statements and, thus, not in violation of his fourth amendment rights. The State conceded that the police did not have probable cause to arrest defendant when he was approached at the bar by Detective Wiggins.

When determining whether a statement has been voluntarily given, the court will look to the "totality of the circumstances." (*People v. Martin* (1984), 102 Ill. 2d 412, 426-27, 466 N.E.2d 228; *People v. Prim* (1972), 53 Ill. 2d 62, 70, 289 N.E.2d 601, *cert. denied* (1973), 412 U.S. 918, 37 L. Ed. 2d 144, 93 S. Ct. 2731.) "The test is whether it has been made freely, voluntarily and without compulsion or inducement of any sort or whether the defendant's will was overcome at the time he confessed." (*People v. Prim* (1972), 53 Ill. 2d 62, 70, 289 N.E.2d 601.) Even where individual facets of police conduct would not be coercive if taken singly, a combination of circumstances may act together to create sufficient pressure on the accused to produce a confession that is not "voluntary." (*People v. Patterson* (1986), 140 Ill. App. 3d 421, 425, 488 N.E.2d 1283; *People v. Washington* (1980), 90 Ill. App. 3d 632, 634, 413 N.E.2d 170, *cert. denied* (1981), 454 U.S. 846, 70 L. Ed. 2d 132, 102 S. Ct. 162.) Here, the trial court found that when the initial circumstances of defendant's encounter with the police officers was taken singly no arrest had taken place, but that when these circumstances were examined in connection with the events which took place during the interrogation, the nature of investigation had changed sufficiently to constitute arrest. Therefore, we will focus our attention on analyzing the evidence indicative of whether defendant was in custody. In determining whether defendant was in custody or otherwise deprived of his freedom in any significant manner prior to questioning the following factors are relevant: (1) the place where the interrogation took place; (2) any statements or nonverbal conduct on the part of the police indicating an accused is not free to leave; (3) the extent of the knowledge of the police officers

and the focus of their investigation; (4) the intentions of the police officers; and (5) the objective circumstances surrounding the investigation to determine what a reasonable man innocent of any crime would perceive. *People v. Smith* (1986), 150 Ill. App. 3d 524, 528, 501 N.E.2d 1010; *People v. Romano* (1985), 139 Ill. App. 3d 999, 1009, 487 N.E.2d 785.

■ After applying these factors to the instant case, we conclude that the trial court's factual findings are not against the manifest weight of the evidence. We analyze these factors in sequence from the time defendant became the focus of the investigation (see *People v. Fuller* (1986), 141 Ill. App. 3d 737, 490 N.E.2d 977; *People v. Meddows* (1978), 67 Ill. App. 3d 995, 385 N.E.2d 765) to the point he made the inculpatory statement. Defendant became the target of the investigation based on a combination of circumstantial evidence and the investigating officer's personal knowledge of defendant's prior arson. Defendant was approached by this investigating officer at a public establishment, close to midnight. Time and location of the initial contact with the police officers are factors that may be taken into consideration where examining the issue of voluntariness. (See *People v. Savory* (1982), 105 Ill. App. 3d 1023, 435 N.E.2d 226; *People v. Hentz* (1979), 75 Ill. App. 3d 526, 394 N.E.2d 586.) The testimony given by defendant and Officer Wiggins are conflicting as to whether the officer threatened defendant with arrest if he did not accompany the officer to the police station. The trial court found: "No force was used or threatened; and while defendant claims he was told he would be arrested if he did not cooperate, it is more credible that the defendant *merely acceded* to the detective's request to answer some questions." (Emphasis added.) We conclude that this finding is not against the manifest weight of the evidence. Defendant was then taken by a uniformed police officer in a squad car to the police station. The record shows defendant had no means of freely exiting the squad car, as it locks from the outside. ( See *People v. Kennedy* (1978), 66 Ill. App. 3d 267, 383 N.E.2d 713.) When defendant arrived at the police station he was taken to an interrogating room, a procedure with which he was familiar from previous encounters with the police. Defendant was given *Miranda* warnings, which he waived. While in the interrogation room, defendant was not left alone at any time and did not appear to be able to move freely about the station. He was under continuous interrogation for almost three hours until he made the inculpatory statement. The circumstances are sharply different from those in *People v. Finklea* (1983), 119 Ill. App. 3d 448, 456 N.E.2d 680. In *Finklea*, defendant was allowed to move around the

police station unescorted and was not under continuous interrogation. (Accord, *People v. Patterson* (1986), 140 Ill. App. 3d 421, 488 N.E.2d 1283.) The trial court found:

"At that time [when defendant was given *Miranda* warnings] and for another two hours and forty-five minutes, when the defendant made incriminating statements, the police had no probable cause to arrest the defendant.

At that point just prior to the [inculpatory] statements, *under the accumulated circumstances*, it might be concluded that the nature of the proceedings had been transformed from a mere investigatory stop to a situation in which a reasonable person could believe he was bound to remain in the presence of the police." (Emphasis added.)

We conclude that this finding is supported by the manifest weight of the evidence. The totality of circumstances indicates that the officers interrogated defendant in the hope of obtaining sufficient information to establish probable cause to effectuate an arrest. See *Dunaway v. New York* (1979), 442 U.S. 200, 60 L. Ed. 2d 824, 99 S. Ct. 2248; *People v. Townes* (1982), 91 Ill. 2d 32, 435 N.E.2d 103.

■ Despite its factual findings, the trial court stated that this court's decision in *Finklea* precluded it from granting defendant's motion to suppress. We agree with defendant that *Finklea* is inapposite in this case. In *Finklea* the defendant was informed, *both* at the time he was asked to come to the police station *and* during questioning, that he was not under arrest. He was not under continuous interrogation and at times was left alone in the interview room. The defendant in *Finklea* was also allowed to move around the police station unescorted. This court, therefore, held that:

"Viewed objectively, these facts support *the trial court's finding* to the effect that a reasonable, innocent person of defendant's age and intelligence would not have believed that he was bound to remain in the presence of the police under the circumstances recited." (Emphasis added.) *People v. Finklea* (1983), 119 Ill. App. 3d 448, 453, 456 N.E.2d 680.

In the instant case, the trial court made just the opposite factual finding. Thus, its reliance on *Finklea* is misplaced. Accordingly, we hold that defendant's fourth amendment rights were violated when, without probable cause, the police subjected him to lengthy continuous questioning at the police station. Since the inculpatory statements were the product of an illegal detention, his motion to suppress should have been granted.

Based on the Illinois Supreme Court's decision in *People v. John-*

*son* (1986), 114 Ill. 2d 69, 499 N.E.2d 470, we reverse defendant's aggravated-arson conviction. We reverse the judgment of the circuit court of Kane County and remand the arson cause for further proceedings.

Reversed and remanded.

UNVERZAGT and INGLIS, JJ., concur.